# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMELIA FAIRLEY and ASHLEY REDDICK, | ) | |
| on behalf of themselves and all those similarly | ) | |
| situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| v. | ) | Judge: |
| | ) | |
| McDONALD'S CORPORATION, | ) | Jury Demanded |
| McDONALD'S USA, LLC, | ) | |
| and McDONALD'S RESTAURANTS OF | ) | |
| FLORIDA, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

### NATURE OF THE ACTION

1.      This is a civil rights and employment discrimination class action brought by

Plaintiffs Jamelia Fairley and Ashley Reddick on behalf of themselves and similarly-situated

female employees of restaurants owned and operated in Florida by the Chicago-based

McDonald's corporation, for sexual harassment and retaliation in violation of Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq*. ("Title VII"), and the Florida

Civil Rights Act, Chapter 760, Florida Statutes ("FCRA").  Defendants are the corporate entities

that comprise Plaintiffs' employer:  McDonald's Corporation, McDonald's USA, LLC, and

McDonald's Restaurants of Florida, Inc. (together, "McDonald's" or "Defendants").

2.       McDonald's, one of the largest employers in the country, creates and permits a

toxic work culture from the very top—as reflected by former-CEO Steve Easterbrook's recent

firing for an inappropriate relationship with a subordinate[1]—and throughout its thousands of restaurants within the United States that employ over one million workers.

3.      McDonald's workers nationwide – and women in particular-- have for years been telling their stories of routine, severe sexual harassment and abuse.[2]  Among them are teenagers, to whom the company promises "America's best first job" and instead delivers predation.[3]  McDonald's employees are literally taking to the streets to protest the mistreatment that is endemic to their daily lives at the company.[4]  McDonald's employees -- women in particular -- report routine harassment at the hands of supervisors, co-workers, and customers.  They also describe swift and severe retaliation for objecting to such mistreatment, and an utter failure to discipline harassers or remedy hostile work environments.[5]  And they are speaking out about the

---

[1]    *See, e.g.*, Heather Haddon & Suzanne Vranica, "McDonald's Looks Beyond Party Culture," THE WALL STREET JOURNAL (Jan. 5, 2020), https://www.wsj.com/articles/mcdonalds-looks-beyond-party-culture-11578243600.

[2]    *See, e.g.*, Áine Cain, *Gretchen Carlson Spotlighted McDonald's Workers Speaking Out Against Sexual Harassment at the Fast Food Giant in Her New Series*, BUSINESS INSIDER (Jan. 15, 2019), https://www.businessinsider.com/mcdonalds-workers-sexual-harassment-gretchen-carlson-show-2019-1.

[3]    *See, e.g.*, Taja Davis, *Tucson Teen Takes on McDonald's; Sexual Harassment Claims*, KGUN 9 (May 22, 2019), https://www.kgun9.com/news/local-news/tucson-teen-takes-on-mcdonalds-sexual-harassment-claims.

[4]    *See, e.g.*, Heather Haddon, *McDonald's Workers Strike to Protest Pay and Harassment Complaints*, THE WALL STREET JOURNAL (May 23, 2019), https://www.wsj.com/articles/mcdonalds-workers-strike-to-protest-pay-and-harassment-complaints-11558627417; Kim Elsesser, *McDonald's Workers Are Striking Over Sexual Harassment, But Will the Company Act?*, FORBES (Sept. 17, 2018), https://www.forbes.com/sites/kimelsesser/2018/09/17/mcdonalds-workers-strike-over-sexual-harassment-but-will-mcdonalds-act/#19ebc1b43f26.

[5]    *See, e.g.*, Christopher Yee, *Employee to Feds: Sexual Harassment Runs Rampant at Monterey Park McDonald's*, PASADENA STAR-NEWS (May 24, 2019), https://www.pasadenastarnews.com/2019/05/24/employee-to-feds-sexual-harassment-runs-rampant-at-monterey-park-mcdonalds/.

losses caused by harassment at McDonald's—not just wages and benefits, but also their emotional well-being and sense of dignity.[6]

4.     McDonald's has long been aware of, and failed to address, this endemic problem. In part because of these workers' brave efforts to speak up, the hundreds of charges filed with the Equal Employment Opportunity Commission (EEOC) and state civil rights agencies, and over 80 federal lawsuits and countless state lawsuits detailing severe or pervasive harassment at McDonald's restaurants around the country, McDonald's is well aware that its policies are woefully insufficient to protect all of its employees, but female employees in particular, and to prevent or remedy sexual harassment. By failing to revise its nationwide policies and practices to stem the tide of harassment and retaliation against female employees in its restaurants, McDonald's has knowingly perpetrated a pattern and practice of sex discrimination by forcing women to work in hostile work environments.

5.     McDonald's has attempted to distance itself from the sexual harassment faced by women workers nationwide by contending that only franchisees, and not the McDonald's corporation, should bear any responsibility for protecting McDonald's employees.[7] Even setting aside the issue of McDonald's corporate responsibility for the franchisee-owned restaurants, McDonald's itself undisputedly owns and operates over 650 non-franchised restaurants in the

---

[6]     *See, e.g.*, Delisha Rivers, *I'm One of 25 People Who Filed a Sexual Harassment Complaint against McDonald's. Here's My Story.*, Vox (May 30, 2019), https://www.vox.com/first-person/2019/5/30/18644181/mcdonalds-sexual-harassment-me-too.

[7]     McDonald's relationship with its franchisees is one of extreme control—from the training of managers at Hamburger University in Chicago to imposition of policies that impact the daily lives of all employees. Indeed, McDonald's exerts such control over franchise restaurants' operations that it is the joint employer of workers at franchised restaurants. Moreover, McDonald's also tricks workers at franchise restaurants into thinking that they are directly employed by McDonald's by, among other things, operating a nationwide job application network, such that the franchisees are apparent agents of McDonald's.

United States, and directly employs some 40,000 restaurant-level employees at its corporate owned and operated "McOpCo" restaurants. McDonald's bears direct responsibility for these workers, and the hostile atmosphere and abuse that they suffer.[8]

6.      The largest concentration of corporate owned and operated McOpCo restaurants is in Florida, where McDonald's owns and operates over 100 restaurants. The experiences of the Plaintiffs, who worked for McDonald's at a corporate owned and operated Florida McOpCo restaurant, are emblematic of McDonald's systemic sexual harassment problem: As Plaintiffs recount, they and many of their fellow female co-workers were subjected to severe or pervasive sexual harassment and a hostile work environment, including groping, physical assaults, and sexually-charged verbal comments. Rather than protect workers, McDonald's restaurant-level managers, as well as regional supervisors and human resources professionals with authority over broad swaths of McDonald's corporate owned and operated Florida McOpCo restaurants, knowingly stood by and allowed the harassment to continue unabated, while ultimately retaliating against the women who complained. McDonald's strategy in Florida appears to be: deny, ignore, and punish anyone who complains too loudly, and at times, move harassers from one restaurant to another restaurant, where they have access to and can further harass more women.

7.      Despite being on notice of pervasive problems of sexual harassment at its corporate owned and operated McOpCo restaurants nationwide, including in Florida,

---

[8]      McDonald's Corporation's most recent SEC Form 10-K filing (2019 Annual Report filed 2/26/20) reflects that it operates McDonald's restaurants and has "Company-owned and operated restaurant employees." *See* MCDONALD'S CORP. FORM 10-K at 3, 5 (February 26, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/63908/000006390820000022/mcd-12312019x10k.htm.

McDonald's fails to address such unlawful sexual harassment and the company culture that enables it:

- McDonald's does nothing to assure sexual harassment training actually takes place or actually succeeds in preventing harassment, despite paying lip service to training crew members;

- On information and belief, McDonald's also does nothing to train in-restaurant managers about how to respond to harassment complaints and prevent harassment, and fails to hold accountable those managers who allow harassment to flourish, or who retaliate against those who report harassment;

- On information and belief, McDonald's also fails to train its regional managers who supervise numerous restaurants, and/or provide human resources consulting services for numerous restaurants, in how to respond to harassment complaints and prevent harassment, and also fails to hold accountable those upper level managers who allow harassment to flourish and/or retaliate against those who dare to complain; and

- McDonald's does nothing to monitor serial harassers or problem restaurants or areas or regions, permitting management to simply shuffle harassers around to different restaurants, where they harass anew.

8.    Instead of taking responsibility to address and eliminate this pervasive hostile work environment at its restaurants, McDonald's exerts operational pressure on managers to continue to staff restaurants with the managers and crew members that perpetuate hostile work environments.  In short, McDonald's puts profits above people, protecting harassers so long as they keep flipping burgers, rather than protecting women workers subjected to unwelcome and

offensive verbal and physical abuse. The result is predictable: women workers in McDonald's corporate owned and operated restaurants nationwide, including McOpCo restaurants in Florida, are subjected to severe and pervasive sexual harassment and a hostile work environment.

9. McDonald's female employees have suffered greatly as a result of the hostile environment which McDonald's perpetuates. Many are working at low-paid, difficult jobs because they have little other option, because of language barriers, because of their age, because of a lack of formal education, or for other reasons. So instead of being able to quit and find work elsewhere, they must endure, at great personal cost. The experiences of women who suffer sexual harassment stay with them for a lifetime, causing emotional and even physical pain, and continuing damage to self-esteem and emotional and physical health. While money cannot make someone whole for experiencing abuse, Plaintiffs ask the Court to award at least $100,000 in compensatory damages per woman for the harassment and hostile work environment these women have endured. For the female workers at the roughly 100 McDonald's corporate-owned Florida restaurants, that adds up to over $500 million in compensatory damages.

10. To remedy these systemic problems and civil rights violations by McDonald's, Plaintiffs ask this Court to (a) certify a class of female employees at McDonald's corporate owned and operated "McOpCo" restaurants in the State of Florida; (b) enter an order declaring that McDonald's violates the civil rights of Plaintiffs and class members under Title VII and FCRA by subjecting them to a hostile work environment; (c) award damages to compensate Plaintiffs and class members for their emotional distress and other injuries; (d) enter an order requiring that McDonald's take adequate steps to stop and prevent sexual harassment by implementing effective worker-centered anti-harassment policies and procedures; worker-led mandatory training; a safe and effective system of reporting (including above the restaurant

level); adequate training of in-restaurant and upper level management, particularly with respect to investigation of sexual harassment complaints and discipline therefore; policies and procedures mandating adequate investigation into, and discipline for, sexual harassment; and protections against retaliation, as required to avoid continued violations of Title VII and FCRA; and (e) award punitive damages sufficient to deter McDonald's from its continuing egregious violation of civil rights.

## PARTIES

11.     Plaintiff Jamelia Fairley  ("Ms. Fairley") is a 24-year-old resident of Lake Mary, Florida who currently works at the corporate owned and operated McOpCo McDonald's restaurant located at 112 South French Avenue in Sanford, Florida (the "South French Avenue restaurant") as a crew member.  Ms. Fairley brings this action individually and on behalf of the proposed Class.

12.     Plaintiff Ashley Reddick (hereinafter "Ms. Reddick") is a 28-year-old resident of Sanford, Florida who formerly worked as a crew member and crew trainer at the South French Avenue restaurant.  Ms. Reddick brings this action individually and on behalf of the proposed Class.

13.     Defendant McDonald's Corporation is a Delaware corporation that has its principal place of business in Chicago, Illinois, and operates restaurants in all 50 states.

14.     Defendant McDonald's USA, LLC ("McDonald's USA") is a Delaware limited liability company that has its principal place of business in Chicago, Illinois, and operates restaurants in all 50 states.  McDonald's USA is a wholly-owned subsidiary of McDonald's Corporation.

15.     Defendant McDonald's Restaurants of Florida, Inc. ("McDonald's Restaurants of Florida") is a Florida profit corporation that has its principal place of business in Chicago,

Illinois, and operates McDonald's restaurants throughout Florida. McDonald's Restaurants of Florida is a wholly-owned subsidiary of McDonald's USA.

16.     The Florida corporate registrations for McDonald's Corporation, McDonald's USA, and McDonald's Restaurants of Florida reflect that all three entities share the same principal place of business, McDonald's headquarters at 110 N. Carpenter Street, Chicago, IL 60607-2101, and share many of the same officers.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter under 28 U.S.C. §1332 (federal question), based upon Plaintiffs' claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

18.     Venue is proper in the Northern District of Illinois pursuant to 42 U.S.C. §2000e-5(f)(3), because the unlawful employment policies and practices were developed and implemented at McDonald's headquarters in Chicago, Illinois (including training of managers at Hamburger University in Chicago), and because the employment records relevant to such policies and practices are maintained at McDonald's headquarters in the Northern District of Illinois.

19.     Because the unlawful employment policies and practices were developed at McDonald's headquarters in Chicago, Illinois, this case should be assigned to the Eastern Division of the Northern District of Illinois.

## FACTUAL ALLEGATIONS

**A.**  **McDonald's Owns, Operates, and is Responsible for the Work Environment of Over 100 Corporate-Owned Restaurants in Florida.**

20.     McDonald's Corporation, McDonald's USA, and McDonald's Restaurants of Florida comprise a single integrated enterprise that owns and operates all the corporate owned and operated McDonald's restaurants in Florida, and employs the workers at those restaurants.

21.     McDonald's USA operates approximately 650 "McOpCo" restaurants across the United States—restaurants directly owned and operated by McDonald's, rather than by a franchisee.  On information and belief, these McOpCo restaurants employ approximately 40,000 restaurant employees across the United States.

22.     The state of Florida has the greatest number of McOpCo stores—over 100— employing, on information and belief, in excess of 6,000 workers.

23.     As a single integrated enterprise, the Defendants jointly control the working conditions of employees at McDonald's corporate owned and operated McOpCo restaurants, including those in Florida, including with respect to Human Resources policies, the physical work environment, required worker and manager training, and hiring, discipline, transfer, and firing of workers, among others.  The Defendants develop and set common policies at their Illinois headquarters with respect to training about and prevention of sexual harassment in McDonald's corporate owned and operated McOpCo restaurants, and with respect to reporting and investigating complaints of sexual harassment in McDonald's McOpCo restaurants, but those common policies are wholly inadequate and ineffective.  McDonald's also trains restaurant General Managers and managers above the restaurant level at "Hamburger University" at its Chicago headquarters.

24.     Together, all Defendants operated the McDonald's corporate owned and operated McOpCo stores in Florida during the relevant period and jointly employed all workers there, including Plaintiffs, class members, and managers, as well as higher-level supervisors and HR representatives with authority over multiple stores in Florida.

25.     McDonald's Corporation, McDonald's USA, and McDonald's Restaurants of Florida are jointly liable for their failure to prevent and remediate the acts of sexual harassment, retaliation, discrimination and civil rights violations complained of herein.

**B.      Plaintiffs Jamelia Fairley and Ashley Reddick were Subjected to Severe or Pervasive Sexual and Sex-Based Harassment, a Sexually Hostile Work Environment, and Retaliation.**

**1.      Plaintiff Jamelia Fairley**

26.     Ms. Fairley has worked at the South French Avenue restaurant as a crew member since about September 2016.  Ms. Fairley is a single mother earning barely above minimum wage at McDonald's to care for and support herself and her young daughter.

27.     When she first started working at McDonald's, Ms. Fairley was required to sign a paper saying that she had received a copy of an employee handbook that contained McDonald's stated policy against sexual harassment for McOpCo employees, but she was not given any actual training regarding sexual harassment or how to report it.

28.     While working at the South French Avenue restaurant, Ms. Fairley was subjected to, and witnessed, sexual and sex-based harassment, and later experienced retaliation for reporting and opposing such harassment.

29.     In December 2018, co-worker Brian Newton began making unwelcome and sexual comments to Ms. Fairley, including telling her that she had a "fat ass" and "I'll take you for a ride."

30.     Although Ms. Fairley made clear that such comments were unwelcome, inappropriate, and offensive, and that she was not interested in having sex with Newton, his conduct worsened.

31.     Beyond the verbal taunts, Ms. Fairley endured frequent physical assaults by Newton.  Newton began pinching her buttocks on numerous occasions, rubbing his hand in her groin area, and touching her hair.  He also grabbed Ms. Fairley by the waist and pulled her back into his groin area, "dry-humping" her from behind.

32.     Whenever Newton harassed her, Ms. Fairley repeatedly told him to stop, and said things like, "I'm serious, don't touch me!"  Yet the harassment continued.

33.     The harassment was openly committed, was not secret, and was known to management.  Other co-workers and a shift manager routinely witnessed Newton touching Ms. Fairley without her consent, but did nothing to stop the harassment.  Shift Manager Mary (last name unknown) ("Shift Manager Mary") and two other female co-workers all witnessed Newton grab Ms. Fairley by the waist and "dry hump" her.  On information and belief, Shift Manager Mary did not report Newton's behavior or take any other steps to stop him from harassing Ms. Fairley.

34.     In mid-December 2018, shortly after the harassment started, Ms. Fairley reported Newton's harassing conduct, including that he had rubbed his private parts against her while working, to Shift Manager Thu Tran ("Shift Manager Tran"). Shift Manager Tran told Newton to stop, but this warning had no effect whatsoever, as Newton continued the harassment, even later that same day.  On information and belief, Shift Manager Tran took no further steps to stop the harassment or prevent further harassment, such as by disciplining Newton, or reporting the harassment to the General Manager or other upper level managers.  On information and belief,

McDonald's had failed to train Shift Manager Tran about managers' responsibility to report and prevent sexual harassment, and had failed to provide Shift Manager Tran with adequate human resources tools to do so.

35. Ms. Fairley then reported Newton's conduct to her General Manager, Pedro Jimenez ("General Manager Jimenez"), who said he would "talk to" Newton. Nevertheless, the harassment continued. On information and belief, General Manager Jimenez failed to take effective steps to prevent and stop future harassment, such as disciplining Newton, or reporting Newton to managers above the restaurant level. On information and belief, McDonald's had failed to train General Manager Jimenez about General Managers' responsibility to report and prevent sexual harassment, and had failed to provide General Manager Jimenez with adequate human resources tools to do so.

36. On or about January 9, 2019, Newton again attempted to rub his private parts against Fairley, and tried to take her hand and put it on his groin area.

37. Ms. Fairley again reported this behavior to another Shift Manager, Kneitra (last name unknown) ("Shift Manager Kneitra"), who checked the video cameras and confirmed that Newton had attempted to assault Ms. Fairley. However, Shift Manager Kneitra told Ms. Fairley that she should have reported the conduct to a different shift manager, Shift Manager Jelly, who had been on duty at the time of the incident. On information and belief, Shift Manager Kneitra took no further steps to stop the harassment or prevent further harassment, such as by disciplining Newton, or reporting the harassment to the General Manager or other upper level managers. On information and belief, McDonald's had failed to train Shift Manager Kneitra about managers' responsibility to report and prevent sexual harassment, and had failed to provide Shift Manager Kneitra with adequate human resources tools to do so.

38.     Meanwhile, another male employee, a maintenance employee named Matthew Capshaw ("Capshaw"), also harassed Ms. Fairley, making comments to her and other female employees such as, "What kind of underwear do you wear?" and "Do you suck dick?"  Ms. Fairley made clear that such comments were offensive and unwelcome.

39.     Nevertheless, on or about January 6, 2019, Capshaw said to Ms. Fairley—after asking her the age of her then-one-year old daughter—"How much would it be to fuck your daughter?" Another male co-worker overheard the remark and laughed.

40.     Ms. Fairley immediately reported this offensive and upsetting comment to Shift Manager Mary, who confirmed with Capshaw that he had made the comment, but took no further action.  On information and belief, Shift Manager Mary took no further steps to stop the harassment or prevent further harassment, such as by disciplining Capshaw, or reporting the harassment to General Manager Jimenez or other upper level managers.  On information and belief, McDonald's had failed to train Shift Manager Mary about managers' responsibility to report and prevent sexual harassment, and had failed to provide Shift Manager Mary with adequate human resources tools to do so.

41.     Ms. Fairley subsequently also reported Capshaw's alarming statement to another shift manager, and to General Manager Jimenez.  Plaintiff Fairley also again reported that she had been sexually harassed by Newton to General Manager Jimenez.

42.     On January 16, 2019, General Manager Jimenez finally asked Ms. Fairley to write statements about the previously-reported incidents involving Newton and Capshaw, and she complied.   It was only after Fairley had been harassed by a second man—Capshaw—that General Manager Jimenez finally took statements from Ms. Fairley and apologized to her for not taking her earlier complaint about Newton seriously.

43.     The following day, McDonald's Operations Consultant Yvonne Collins ("Operations Consultant Collins"), who is responsible for supervising a group of McOpCo restaurants, came to the South French Avenue restaurant and asked to speak with Ms. Fairley. Operations Consultant Collins asked Ms. Fairley what had happened, and Ms. Fairley again reported the harassment to which she had been subjected by Newton and Capshaw.  Operations Consultant Collins gave Ms. Fairley no further information.

44.     Eventually, Capshaw, who had confessed to his inappropriate behavior, was terminated.  However, subsequently, Shift Manager Kiara pressured Ms. Fairley by asking why she got her friend Capshaw fired.  Shift Manager Mary was also present during the exchange. This type of treatment, and managers' open disdain for Ms. Fairley as a result of her reporting the sexual harassment, made Ms. Fairley uncomfortable nearly every time she worked, and caused her emotional distress.

45.     On information and belief, neither General Manager Jimenez, Operations Consultant Collins, or Jessica Goodwin, the HR Representative with responsibility over the South French Avenue restaurant ("HR Representative Goodwin"), undertook any meaningful investigation concerning Newton's harassing conduct, such as by asking any other potential witnesses to provide statements about Newton's harassment of Ms. Fairley or interviewing other victims of Newton's harassment, even though numerous restaurant employees had seen and were aware of the ongoing harassment.

46.     Instead, Operations Consultant Collins belatedly asked only Newton—the accused— to provide a statement.  Based solely upon Newton's statement that he had not harassed anyone, and giving no weight to Ms. Fairley's detailed written statement, the videotape showing the harassment, and other workers who had experienced or witnessed harassment,

Operations Consultant Collins, acting in concert with HR Representative Goodwin, found that there was "not significant evidence to support the allegation" of harassment. Newton faced no consequences for his sexual harassment of Ms. Fairley.

47.     In late January 2019, Newton was transferred to another store, ostensibly for "safety concerns" after he was threatened by a customer in the drive-through. On information and belief, the customer threatened Newton because he believed Newton had harassed a friend of the customer, who also worked for McDonald's.

48.     Both Newton and Capshaw were permitted by management to interact with Ms. Fairley, even after they no longer worked at the South French Avenue restaurant. Newton's sister still worked at the restaurant, and Newton came in to see her; while there, he would order food from Ms. Fairley, who frequently worked as a cashier. Despite having been terminated, Capshaw still was allowed to have lunch at the restaurant with Shift Manager Mary.

49.     Being repeatedly confronted with Capshaw and Newton when they returned to the South French Avenue restaurant caused Ms. Fairley continued emotional distress and anxiety. She ultimately changed her shift in order to avoid encountering them.

50.     Before reporting the incidents of harassment by Newton and Capshaw in late 2018 and early 2019, Ms. Fairley typically worked four days per week for approximately 25 hours per week. She had never been disciplined at work and had generally received positive feedback.

51.     After reporting the harassment to her managers, however, Ms. Fairley's hours were drastically reduced. On information and belief, managers at the South French Avenue store reduced Ms. Fairley's hours because they were angry that she had reported sexual harassment by their co-workers/friends, and that Capshaw was fired as a result.

52.     This dramatic reduction in hours caused Ms. Fairley severe emotional distress and anxiety, because the resulting reduction in pay made it extremely difficult for Ms. Fairley, as a single mother earning barely above minimum wage, to adequately care for her young daughter.

53.     Because McDonald's reduced Ms. Fairley's hours and did nothing to prevent her harassers from repeatedly coming in contact with her, thereby forcing her to continue to deal with them, Ms. Fairley sought to remove herself from her hostile and traumatic work environment by requesting a transfer to another McDonald's McOpCo restaurant. But the only restaurant to which McDonald's would transfer Ms. Fairley was the one to which one of her harassers (Newton) had been transferred.

54.     Specifically, on March 12, 2019, Ms. Fairley called Operations Consultant Collins to request a transfer, explaining that her manager and co-workers were punishing her for having complained of harassment, and that Newton continued to frequent the South French Avenue restaurant as a customer because his sister still worked there. Operations Consultant Collins told Ms. Fairley that she could only transfer to one other restaurant—the restaurant to which Newton had already been transferred. Not wanting to transfer to the restaurant where one of her harassers was employed, Fairley asked if any other restaurants were available. Showing no urgency and failing to delegate or reassign the task to transfer Fairley away from her harassers, Operations Consultant Collins told Fairley that she was going on vacation and would "look into it" when she got back.

55.     When Operations Consultant Collins took no action, Fairley called a phone number listed on a poster in the South French Avenue restaurant's employee break room. After encountering eight automated dial choices, Fairley was eventually transferred to an HR representative's extension. The HR representative did not pick up, however, so Fairley left a

message with her identification numbers and name. The HR representative never returned her call.

56. Desperate, Fairley initiated her own research into other restaurant locations to which she might be able to transfer, given the constraint that she relied on public transportation to commute to work. She identified one potential McDonald's McOpCo restaurant located in Lake Mary, Florida (the "Lake Mary restaurant").

57. Ms. Fairley subsequently asked Operations Consultant Collins about transferring to the Lake Mary restaurant, but Operations Consultant Collins refused, telling Ms. Fairley that the Lake Mary restaurant had no openings. This was false. On information and belief, due to turnover, McDonald's restaurants almost always have openings. For example, a July 2019 job posting for the Lake Mary McDonald's restaurant listed both part-time and full-time crew member positions, with opportunities "available practically anytime: breakfast, lunch, late nights, weekends – whatever."

58. On information and belief, Operations Consultant Collins denied Ms. Fairley's request for transfer in retaliation for Fairley's reports of sexual harassment.

59. Because Operations Consultant Collins denied her transfer request, Ms. Fairley was forced to continue working at the South French Avenue restaurant, in continuing contact with both of her harassers because of their relationships to other workers at that restaurant, and subject to the continued retaliation by her managers.

60. Because of the severe and pervasive harassment, hostile work environment, and retaliation that she was forced to endure, Ms. Fairley suffered severe emotional distress and anxiety, as well as lost income.

61. Ms. Fairley continues to suffer emotional distress and other negative effects from the severe and pervasive harassment she was forced to endure.

### 2. Plaintiff Ashley Reddick

62. Ms. Reddick worked at the South French Avenue restaurant from approximately October 28, 2015 to September 9, 2018, when she was fired in retaliation for reporting sexual harassment. Ms. Reddick was initially hired as a crew member, and was subsequently promoted to crew trainer in or about April 2016.

63. When she first started working at McDonald's, Ms. Reddick was required to sign a paper saying that she had received a copy of an employee handbook that contained McDonald's stated policies against sexual harassment for McOpCo employees, but she does not remember ever seeing the handbook, let alone receiving a copy to keep, nor was she provided with any other training regarding sexual harassment or how to report it. Even when she became a became a crew trainer, Ms. Reddick received no specific training regarding sexual harassment, much less regarding management obligations to prevent or remedy harassment.

64. While working at the South French Avenue restaurant, Ms. Reddick was subjected to, and witnessed, sexual and sex-based harassment, and later, retaliation for reporting and opposing such harassment.

65. In April 2018, a male co-worker, Marquis Frazier, known as "Marso," began making unwelcome and sexual comments to Ms. Reddick on a daily basis, including "Damn, I wonder what you taste like," "I got to have you," and, "I didn't know you had boobs like that."

66. Although Ms. Reddick made clear that such comments were unwelcome, inappropriate, and offensive, Marso's conduct worsened.

67. Beyond the verbal harassment, Marso subjected Ms. Reddick to frequent physical assaults. Marso would rub his groin area against Ms. Reddick when she was at the fry station or

18

in the kitchen, touch Ms. Reddick's thighs, and rub against her shoulders, even though she repeatedly made clear that such behavior was offensive and unwelcome.

68.     On or about May 2018, when Ms. Reddick was in the back of the store, Marso stood next to her, held his phone in front of her face displaying a picture of his erect penis, and said, "Do you think you can handle this," or words to that effect.

69.     Offended and disgusted, Ms. Reddick immediately reported the incident and Marso's other behavior to Manager Debbie Turner ("Manager Turner").  Manager Turner said she would "talk to" Marso, but the harassment continued.  On information and belief, Turner took no action to investigate the sexual harassment or to prevent further harassment.  On information and belief, McDonald's had failed to train Manager Turner about managers' responsibility to report and prevent sexual harassment, and had failed to provide Manager Turner with adequate human resources tools to do so.

70.     Only about a week later, when Ms. Reddick went into the men's bathroom to clean it, Marso followed her, cornered her in a confined space, and said, "I'll show you what a big boy can do," or words to that effect.  Ms. Reddick vigorously objected and immediately left the bathroom without cleaning it.

71.     Marso's physical and verbal harassment continued unabated, causing Ms. Reddick great anxiety and emotional distress.

72.     Adding to Ms. Reddick's distress was management's inaction after Ms. Reddick first reported the harassment.  Ms. Reddick felt that she had no recourse, and that additional attempts to report the harassment would be futile.  The generally hostile work environment and pervasive harassment—including harassment of other female employees at the restaurant of

which Ms. Reddick was aware—made Ms. Reddick believe that McDonald's would not treat complaints of harassment seriously.

73.     Because the harassment was so distressing, and because McDonald's had left Ms. Reddick to deal with the harassment entirely on her own, Ms. Reddick would ask to leave early whenever Marso was scheduled to work, in an attempt to avoid him—resulting in lost wages.

74.     Ms. Reddick eventually confided in her brother about the harassment, and he came to the South French Avenue restaurant to confront Marso.  After that, the harassment stopped for a short period, but soon continued anew.

75.     Marso's harassment continued until approximately July 2018, when he stopped working at the South French Avenue restaurant.  On information and belief, Marso left of his own accord, not because McDonald's took any remedial action against him.

76.     In addition to failing to remedy Marso's prolonged harassment, McDonald's also permitted customers to harass Ms. Reddick.

77.     In one incident, Ms. Reddick told a customer that she was "coming" to help him at a particular register, and the man said, "I'll make you cum."

78.     Ms. Reddick reported these incidents to the General Manager, Jackie Alexander ("General Manager Alexander"), but General Manager Alexander took no action.  On information and belief, McDonald's had failed to train General Manager Alexander about managers' responsibility to report and prevent sexual harassment, including from customers, and had failed to provide General Manager Alexander with adequate human resources tools to do so.

79.     Before reporting these incidents of harassment, Ms. Reddick typically worked 8:00 a.m. to 3:00 p.m. every weekday, and would often come in on weekends as well to fill in for other employees who were absent.

80. On or about August 17, 2018, Ms. Reddick was sent home by Operations Consultant Collins, who was at the restaurant that day, allegedly for being "confrontational," although she was not confrontational.

81. Ms. Reddick heard nothing further from any McDonald's managers and was not scheduled for any shifts for the next few weeks, despite inquiring about her schedule.

82. Ms. Reddick was sent a letter officially terminating her employment on September 9, 2018.

83. On information and belief, other employees, especially long-term employees such as Ms. Reddick, were not terminated for being "confrontational." On information and belief, Ms. Reddick was terminated in retaliation for her opposition to and reporting of Marso's sexual harassment.

84. Because of the pervasive harassment and hostile work environment that she was forced to endure during her employment at McDonald's, and because of McDonald's retaliation for her reporting of such harassment, Ms. Reddick suffered severe emotional distress and anxiety, as well as lost income.

85. Plaintiff Reddick continues to suffer emotional distress and other negative effects from the severe harassment she was forced to endure while McDonald's stood by and did nothing.

**C.** **McDonald's Knows That Women It Employs Have Been and Continue to Be Subject to Severe or Pervasive Sexual and Sex-Based Harassment, a Sexually Hostile Work Environment, and Retaliation, and McDonald's Has Failed to Remediate or Prevent that Harassment and Retaliation.**

86. Plaintiffs Fairley and Reddick were not the only McDonald's workers at restaurants in Florida who frequently experienced and observed sexual harassment of which

McDonald's had actual or constructive knowledge, but failed to take adequate steps to prevent or remedy.

87. The three different male employees who harassed Plaintiffs also routinely harassed other women and girls at the South French Avenue restaurant, and, on information and belief, at the restaurants to which they were transferred.

88. For example, Newton, who harassed Ms. Fairley, also harassed other female employees. He made sexual comments to them on numerous occasions, and touched them without their consent, despite their telling him to stop.

89. One of those women, like Ms. Fairley, also reported to General Manager Jimenez that Newton touched her inappropriately, but on information and belief, McDonald's did nothing, and the female employee eventually was forced to quit as a result of the harassing behavior.

90. In January 2019, the same period during which Newton was harassing Ms. Fairley, he also pushed another female employee into the stockroom and rubbed his genitals against her back. That employee also reported the incident to a manager that same day. When she came in to work the next day, she was told she could not come back to work until she had spoken to General Manager Jimenez. As a result, she lost a day's wages. The female employee subsequently spoke to the General Manager by phone, and was asked to provide a written statement, which she did. Another co-worker also provided a written statement corroborating her report of harassment, as well as Ms. Fairley's harassment complaint against Newton. Despite these three statements alleging harassment by Newton, McDonald's did not conduct a thorough investigation or discipline Newton.

91.    On information and belief, in light of McDonald's failure to take action, yet another female employee who was being harassed by Newton eventually told her boyfriend about the ongoing harassment.  On information and belief, the boyfriend showed up at McDonald's and confronted Newton.

92.    It was only then that McDonald's transferred Newton to another restaurant—purportedly for *his* own safety—but took no action to investigate or otherwise address Newton's misconduct against his female co-workers.  As a result of the transfer, Newton had access to a whole new group of women to harass.  In addition, McDonald's continued to permit Newton to frequently visit the South French Avenue restaurant where his sister worked, thereby causing continuing distress to all the women he had harassed while employed there.

93.    Indeed, despite reports by at least three women that he had harassed them and others, including at least two who provided written statements, McDonald's Operations Consultant Collins found that "there was not significant evidence to support the allegation[s]" of sexual harassment.  On information and belief, Operations Consultant Collins and HR Representative Goodwin never disciplined Newton, or imposed any consequences on him for his behavior.  On information and belief, Newton instead continued to harass women at the new McDonald's restaurant to which he was transferred.

94.    McDonald's knew that sexual harassment at the South French Avenue restaurant was not a new phenomenon.  In 2018, another employee of the South French Avenue restaurant filed two formal charges with the EEOC, the first alleging pervasive sexual harassment that was reported to, but not remediated by, General Manager Alexander, and the second alleging that General Manager Alexander terminated her in retaliation for having complained about sexual harassment, and having filed the original EEOC charge.

95. At the South French Avenue restaurant (as with other McDonald's restaurants), employees worked in close proximity to one another, and discussed with one another the harassment to which they were subjected. Consequently, they regularly witnessed, were exposed to, and were aware of harassing conduct even when it was directed at others.[9]

96. This common knowledge and awareness of the pervasive incidents of sexual harassment – in plain view of and without any remedy by management -- contributed to and created a hostile work environment for all female workers at the restaurant. A reasonable woman would perceive such constant and open harassment of female workers as creating an employment environment that was intimidating, hostile, and/or offensive toward women.

97. The work environment at the restaurant that female workers were forced to endure was permeated with sexual harassment so severe or pervasive as to make the restaurant an

---

[9] Research shows that experiencing ambient sexual harassment—that is, a general environment of sexual harassment, which may involve witnessing or hearing about a co-worker's workplace sexual harassment—has demonstrated negative psychological and job-related consequences. For example, one survey showed that bystanders of sexual harassment articulated being less satisfied with life and experienced increased stress, depression and anxiety symptoms, and a desire to withdraw from their workplace. *See generally* Kathy Ann Hanisch, *A Causal Model of General Attitudes, Work Withdrawal, and Job Withdrawal, Including Retirement* (1990) (unpublished Ph.D. dissertation, University of Illinois Urbana-Champaign) (on file with ProQuest Dissertations Publishing) (individuals less satisfied with their work demonstrate withdrawal through frequent tardiness, absences, and desires to leave their positions). Another study found that low-wage workers who experienced ambient sexual harassment exhibited symptoms that mimicked those of individuals who were directly harassed: they were more withdrawn from their work and reported more symptoms of psychological distress, including depression and anxiety. Theresa M. Glomb et al., *Ambient Sexual Harassment: An Integrated Model of Antecedents and Consequences*, 71 ORG. BEHAV. & HUM. DECISION PROCESSES 322–23 (1997). In addition, research shows that the harmful psychological and job withdrawal effects of ambient sexual harassment are not only prompted by direct observation of sexual harassment, but by observation of institutional negligence in effectively dealing with such misconduct. *See, e.g.*, Kathi Miner-Rubino & Lilia M. Cortina, *Beyond Targets: Consequences of Vicarious Exposure to Misogyny at Work*, 92 J. APPLIED PSYCHOL. 1254, 1263–64 (2007).

objectively abusive and hostile workplace for women, thereby altering the terms of their employment.

98.     The harassment at the South French Avenue restaurant was open and notorious.  It was directly reported to multiple restaurant managers, from shift managers up to the General Managers, first Jackie Alexander and then Pedro Jimenez.  The sexual harassment was also reported to the Operations Consultant, Yvonne Collins, and to the HR Representative, Jessica Goodwin, who were responsible for overseeing the South French Avenue restaurant as well as other restaurants in central Florida.  None of these McDonald's management personnel took action reasonably calculated to remedy the sexual harassment and the sexually hostile work environment.  Instead, managers themselves, including managers above the restaurant level, often contributed to the hostile work environment, including by retaliating against Plaintiffs and other class members who reported or opposed harassment.

99.     On information and belief, despite giving Operations Consultant Collins responsibility over a wide swath of McDonald's restaurants in Central Florida, McDonald's failed to train her, or any other Operations Consultant responsible for any other restaurant in Florida, in how to investigate or remedy sexual harassment claims, or how to prevent sexual harassment.  On information and belief, despite giving HR Representative Goodwin responsibility over a wide swath of McDonald's restaurants in Central Florida, McDonald's failed to train her, or any other HR Representative responsible for any other restaurant in Florida, in how to investigate or remedy sexual harassment claims, or how to prevent sexual harassment.

100.     Without adequate training, policies, procedures and guidelines, Operations Consultant Collins and HR Representative Goodwin did not take adequate steps to prevent and remedy sexual harassment at the McDonald's corporate owned and operated McOpCo

restaurants for which they were responsible.  Instead of disciplining known harassers, they transferred them from one restaurant to another, or discharged them but permitted them to continue invading Plaintiffs' workplace, while preventing survivors of harassment from transferring to escape harassment and a hostile work environment.

101.    McDonald's actual and constructive knowledge of unabated severe or pervasive sexual harassment at corporate owned and operated McOpCo restaurants in Florida is not confined to the South French Avenue restaurant.  Rather, McDonald's workers throughout Florida have reported that they were sexually harassed while working at McDonald's, but that McDonald's failed to stop or prevent the harassment.

102.    The hostile work environment experienced by women workers at McDonald's corporate owned and operated McOpCo restaurants in Florida is a predictable result of McDonald's policies and procedures that condoned, and thereby encouraged, such misconduct, resulting in systemic discrimination against women workers.

103.    As McDonald's is aware, many other female employees at McOpCo stores in Florida have complained about pervasive and routine sexual harassment creating a hostile work environment condoned by McDonalds, and retaliation for speaking out or complaining about this harassment.

104.    For example, a woman working at a McDonald's corporate owned and operated McOpCo restaurant in Vero Beach, Florida, filed a federal lawsuit alleging that the store manager harassed her, and that HR did nothing to stop the harassment, despite her complaints.[10] McDonald's settled the lawsuit soon after it was filed.

---

[10]    *Bryant v. McDonald's Corp.*, No. 2:08-cv-141555-DLG (S.D. Fla 2008).

105.     A woman working at a McDonald's corporate owned and operated McOpCo restaurant in Stuart, Florida filed a federal lawsuit alleging that a cashier harassed her, and that she complained to her manager and to the corporate hotline, but that nothing was done.[11] McDonald's settled the lawsuit soon after it was filed.

106.     A woman working at a McDonald's corporate owned and operated McOpCo restaurant in Leon County, Florida, filed a federal lawsuit concerning repeated unwanted touching by one coworker and additional harassment by a second coworker that she reported to her General Manager, who took no action to protect her and instead retaliated against her for complaining.[12] McDonald's settled the lawsuit soon after it was filed.

107.     In 2013, a woman working at a corporate owned and operated McOpCo restaurant in Quincy, Florida, filed a federal lawsuit in which she claimed that General Manager Derrick Morgan was being investigated for having sexually harassed one of her co-workers, that she gave a statement with respect to sexual harassment by General Manager Morgan, and that General Manager Morgan retaliated against her by firing her.[13] McDonald's settled the lawsuit soon after it was filed.

108.     In 2014 a woman working at a corporate owned and operated McOpCo restaurant in Tallahassee, Florida, reported that a shift manager subjected her and other female employees to a hostile work environment, including by commenting on their clothing and appearances and shouting profanities at them, and that General Manager Derrick Morgan failed to stop the harassment that was reported to him.[14] McDonald's settled the lawsuit soon after it was filed.

---

[11]     *Neely v. McDonald's Corp.*, No. 2:09-cv-14047-DLG (S.D. Fla. 2009).
[12]     *Ford v. McDonald's Corp.*, No. 4:11-cv-00474 (N.D. Fla. 2011).
[13]     *Williams v. McDonald's Corp.*, No. 4-13-CV-00133-RH-CAS (N.D. Fla. 2013).
[14]     *Tyler v. McDonald's Restaurants of Florida Inc.*, No. 4:14cv527 (N.D. Fla. 2014).

109.     Despite the fact that General Manager Morgan was named in a federal lawsuit that McDonald's had to settle, McDonald's transferred GM Morgan from the Quincy restaurant to the Tallahassee restaurant, where another woman accused him of participating in and tolerating harassment.  On information and belief, such transfer of problem managers and employees from one restaurant to the other is a common practice, manufacturing the appearance of remedying harassment while in fact simply displacing it to a new location.

110.     A woman who worked at a corporate owned and operated McDonald's McOpCo restaurant in Kissimmee, Florida filed a federal lawsuit alleging that the General Manager repeatedly harassed her.[15]  The case is ongoing.

111.     As the treatment of Plaintiffs and these other examples show, rather than take action to protect all women working at McDonald's by implementing meaningful policies and procedures to address the sexual harassment that it knows is occurring at its corporate owned and operated McOpCo restaurants throughout Florida and the nation, McDonald's ignores the problem and protects harassers until a survivor has the fortitude and resources to find a lawyer and file a lawsuit.  Then, McDonald's settles as quickly as possible, by way of a confidential settlement.  On information and belief, McDonald's regards settlement of sexual harassment cases as a cost of doing business, ignoring the tremendous emotional, physical, and economic cost this harassment has on its women workers.

112.     McDonald's must be aware of the well-publicized studies of fast food workers in particular, and restaurant workers in general, regarding the pervasiveness, and harmfulness, of sexual harassment and the hostile work environments it creates.  For example, a 2016 nationwide survey of non-managerial fast food workers (including many who worked for McDonald's) by

---

[15]     *Zimmerman v. McDonald's*, No. 6:19-CV-1894-PGB-EJK (M.D. Fla. 2019).

Hart Research found that forty-percent of women reported being personally subjected to sexual harassment at their fast food jobs, with serious negative health and professional consequences.[16] Other surveys have reported that the rate of sexual harassment among female restaurant workers may be as high as ninety percent.[17]

113.    McDonald's corporate owned and operated McOpCo Florida stores are not immune to the problem pervasive to this industry and to McDonald's in particular; without effective enforcement of institutional policies and procedures to prevent sexual harassment, women workers will continue to be subjected to sexual harassment and a hostile work environment.

**D.    McDonald's Policies and Procedures Perpetuate Systemic Discrimination Against Women Workers By Failing to Adequately Stop, Prevent, and Remedy Severe or Pervasive Sexual and Sex-Based Harassment and Sexually Hostile Work Environments, and Retaliation for Reporting that Misconduct.**

114.    Plaintiffs and class members were and are subjected to sexually hostile work environments in McDonald's corporate owned and operated McOpCo restaurants as a result of McDonald's failure to put in place effective policies and practices to prevent and remedy sexual harassment, and McDonald's acquiescence in the subsequent, predictable severe or pervasive sexual harassment.

115.    This severe or pervasive harassment, and the failure of restaurant-level and upper-level management to address it despite being on actual and constructive notice of the harassment,

---

[16]    See Hart Research Associates, "Two in Five Women in Fast Food Industry Face Sexual Harassment on the Job," October 15, 2016, at https://hartresearch.com/fast-food-worker-harassment-survey-findings/.

[17]    *The Glass Floor: Sexual Harassment in the Restaurant Industry*, The Restaurant Opportunities Center United (2014); *see also* Stampler, Laura, *66% of Female Restaurant Workers Report Being Sexually Harassed by Managers,* Time Magazine (Oct. 4, 2014); Johnson, Stefanie and Madera, Juan. *Sexual Harassment Is Pervasive in the Restaurant Industry. Here's What Needs to Change,* Harvard Business Review (Jan. 18, 2018).

created a culture that encouraged further misconduct.  Indeed, studies have found that male employees are more willing to engage in sexual harassment in environments where sexist behavior and sexual harassment is modeled by others.[18]

116.    Research shows that what has been termed the "organizational climate" around sexual harassment in a workplace is *the* most important factor in determining—that is, the factor with the greatest statistical effect on—whether workers are subjected to sexual harassment in their workplace.[19]

117.    The "organizational climate" is created by a workplace's policies and practices concerning sexual harassment, including formal written guidelines for behavior, procedures for filing grievances and investigating complaints, and education and training programs, as well as implementation, prevention, and enforcement practices.[20]

118.    Three aspects of an organizational climate that are particularly problematic relate to accountability—that is, a perceived risk to victims for complaining, a lack of sanctions against offenders, and the perception that one's complaints will not be taken seriously.[21]

119.    Research further shows that perceived managerial lenience in effectively handling sexual harassment in the workplace is associated with higher incidences of such conduct.[22]

---

[18]    *See* John B. Pryor et al., *A Social Psychological Analysis of Sexual Harassment: The Person/Situation Interaction*, 42 J. VOCATIONAL BEHAV. 68, 78–79 (1993).

[19]    Chelsea R. Willness et al., *A Meta-Analysis of the Antecedents and Consequences of Workplace Sexual Harassment*, 60 PERSONNEL PSYCHOL. 127, 143 (2007).

[20]    *Id.* at 133–34.

[21]    *Id.*

[22]    *Id.* at 143; Melanie S. Harned et al., *Sexual Assault and Other Types of Sexual Harassment by Workplace Personnel: A Comparison of Antecedents and Consequences*, 7 J. OCCUPATIONAL HEALTH PSYCHOL. 174, 183 (2002); Louise F. Fitzgerald et al., *Antecedents and Consequences of Sexual Harassment in Organizations: A Test of an Integrated Model*, 82 J. APPL. PSYCHOL. 578, 584 (1997); Charles L. Hulin et al., *Organizational Influences on Sexual Harassment*, *in* SEXUAL HARASSMENT IN THE WORKPLACE: PERSPECTIVES, FRONTIERS, AND RESPONSE STRATEGIES 127–50 (Margaret S. Stockdale ed., Sage Publications 4th ed. 1996).

120.    Thus, an organization's actual and perceived ability to recognize, penalize, and reduce sexual harassment influences whether and how it manifests in the workplace.

121.    The mere existence of codes of conduct prohibiting sexual harassment as the main or sole method to mitigate sexual harassment has long been recognized as ineffective; institutional action is necessary.[23]

122.    Individuals who self-identify as working in environments where they believe that reports of sexual harassment will be ignored and whistleblowers will be punished also report experiencing more sexual harassment.[24]

123.    For this reason, Human Resources policies can have the effect of *promoting* sexual harassment in the workplace if they are perceived as lacking in formal procedure and being inattentive to reports or reporters of sexual harassment.[25]

124.    In short, although an employer may not be able to avoid all individual incidents of harassment in the first instance, it can, through proper and effective policies and procedures for the prevention and remediation of harassment, avoid systemic, widespread misconduct and thereby protect its employees.  When an employer does not take affirmative, effective action to protect its workers, however, harassment can and will occur wherever and whenever an

---

[23]    James E. Gruber, *The Impact of Male Work Environments and Organizational Policies on Women's Experiences of Sexual Harassment*, 12 GENDER & SOCIETY 301, 316 (1998).  These findings are similar to the conclusions of previous studies of bullying in the workplace, which find that such behavior positively correlates with laissez-faire management approaches to dealing with interpersonal conflict or harassment.  *See, e.g.*, Helena Cooper-Thomas et al., *The Impact of Bullying on Observers and Targets*, 14 N.Z. J. HUM. RESOURCES MGMT. 82, 83–84 (2014).
[24]    Louise F. Fitzgerald *et al.*, *Antecedents and Consequences of Sexual Harassment in Organizations: A Test of an Integrated Model*, 82 J. APPL. PSYCHOL. 578, 584 (1997).
[25]    Cailin S. Stamarski & Leanne S. Son Hing, *Gender Inequalities in the Workplace: The Effects of Organizational Structures, Processes, Practices, and Decision Makers' Sexism*, 6 FRONTIERS PSYCHOL. 1, 7–8 (2015).

individual with a proclivity for harassment is present in the workplace, and other employees are emboldened to replicate that behavior.

125. at its corporate owned and operated McOpCo restaurants nationwide, including those in Florida, McDonald's has failed and continues to fail to implement the policies and procedures long known to effectively prevent and remediate harassment. Such failure signals to workers that harassment is permitted, and that objecting is futile. McDonald's failure to implement meaningful policies and procedures to prevent and penalize sexual harassment creates the conditions necessary for individual harassers to act on their proclivities for harassment with impunity.

126. McDonald's insufficient policies and procedures for dealing with sexual harassment are conceived, promulgated and operationalized from corporate headquarters in Chicago, and apply to all corporate owned and operated McOpCo restaurants nationwide, including those in Florida. At every level, these measures are insufficient to prevent or remedy sexual harassment, and instead create a culture that fosters and tolerates harassment.

127. Despite the fact that McDonald's advertises itself as "America's best first job," and that it knows that many of its workers are teenaged or recent entrants to the workforce, McDonald's fails to educate workers about what behavior is and is not appropriate in the workplace, including what constitutes sexual harassment, how to report harassment if it occurs, and what steps it will take to remedy harassment of which it is aware. At most, McDonald's provides employees with an employee handbook in which its scant anti-harassment policy is buried, written in legalese, that is insufficient to actually teach workers, particularly younger workers, non-English speaking workers, workers who have not completed high school, and workers with a low literacy level, what they need to know.

128.     McDonald's informs workers, including through its "Open Door" policy posted in employee breakrooms, that they can report problems to any member of the management team, and that speaking directly to a manager is the best way to resolve workplace issues.  That is, workers are encouraged to, and do, report sexual harassment to lower-level in-restaurant managers, including shift managers (who may be the highest level manager on duty on any particular shift), Department Managers, Assistant Managers, or General Managers.

129.     On information and belief, despite putting much of the responsibility for preventing and remedying sexual harassment on these frontline in-restaurant managers, including lower level shift managers, McDonald's does not train, or does not adequately train, in-restaurant managers, including Shift Managers, Department Managers, Assistant Managers, and General Managers, in how to recognize or remedy sexual harassment that they witness, or that is reported to them.

130.     On information and belief, McDonald's does not train, or does not adequately train, in-restaurant managers in how to document reports of sexual harassment, how to investigate sexual harassment (including how to select and interview witnesses and determine credibility), how to document such investigations, how to determine on the basis of an investigation whether sexual harassment has occurred, whether and how to discipline harassers, and how to protect victims of harassment from further harassment or from retaliation for reporting harassment.

131.     Other than a single brief statement in the employee handbook, McDonald's does not, on information and belief, train or adequately train in-restaurant managers to report sexual harassment that they witness or that is reported to them, to managers above the restaurant level to whom such harassment should be reported.  On information and belief, McDonald's does not

hold in-restaurant managers accountable for failure to recognize and report sexual harassment, even sexual harassment that is directly reported to them, such as by factoring such failures into their performance evaluations, or eligibility for raises and promotion.

132.     In-restaurant managers are dependent on having an adequate number of crew members to meet operational needs.  On information and belief, restaurant managers are evaluated (including with respect to eligibility for raises and promotion) based on their meeting certain operational standards, but are not evaluated based on their work to prevent and remedy sexual harassment.

133.     On information and belief, McDonald's does not hold in-restaurant managers accountable for failure to adequately investigate and remedy sexual harassment that is witnessed by or reported to them.  Instead, on information and belief, McDonald's allows operational needs for certain numbers of workers on certain shifts at certain stores to take precedence over any imposed discipline for harassment.  Accordingly, McDonald's policies and practices incentivize in-restaurant McDonald's managers to ignore witnessed or reported sexual harassment, because they do not want to lose crew members needed to operate the restaurant.

134.     McDonald's also informs workers, through posters in breakrooms, that they may report workplace problems, including sexual harassment, by calling a toll free number for HR Consulting, or by contacting the Operations Consultant/Area Manager or HR Representative/HR Consultant assigned to oversee their restaurant.

135.     If workers call the telephone number for HR Consulting, they encounter a complicated voicemail "tree" that never uses the phrase "sexual harassment" or otherwise tells them where to report misconduct.  If employees manage to navigate the voicemail tree and reach a live person, they are shunted back to the HR Representative/HR Consultant assigned to oversee

their restaurant. On information and belief, McDonald's may have recently instituted a new "hotline" to report sexual harassment, but in the end, workers calling to report sexual harassment are still shunted back to the HR Representative/HR Consultant assigned to oversee their restaurant.

136. On information and belief, McDonald's does not train, or does not adequately train, above-restaurant managers responsible for overseeing a number of stores, including but not limited to Operations Consultants and HR Representatives/Consultants, in how to handle sexual harassment that is reported to them. On information and belief, McDonald's does not train, or does not adequately train, above-restaurant managers how to recognize sexual harassment, how to document reports of sexual harassment, how to investigate sexual harassment (including how to select and interview witnesses and determine credibility), how to document sexual harassment investigations, how to determine on the basis of an investigation whether sexual harassment has occurred, whether and how to discipline harassers, and how to protect victims of harassment from further harassment or from retaliation for reporting harassment.

137. On information and belief, McDonald's does not hold above-restaurant managers accountable for failure to adequately investigate and remediate sexual harassment that is reported to them. Instead, on information and belief, McDonald's allows operational needs for certain numbers of workers on certain shifts at certain stores to take precedence over any imposed discipline for harassment. Accordingly, McDonald's policies and practices incentivize above-restaurant McDonald's managers to ignore witnessed or reported sexual harassment, because they do not want to lose crew members needed to operate the restaurants under their command.

138. Restaurant managers and above-restaurant managers also have an incentive not to fire workers, for fear they will apply for unemployment insurance and thereby cost McDonald's

money. Accordingly, above-restaurant managers have an incentive to transfer harassers to a different restaurant rather than firing the harasser.

139. On information and belief, in those instances that managers do discipline employees for having engaged in sexual harassment (or, instead, retaliate by disciplining a worker who complains), McDonald's is aware of those reports. For instance, whenever a General Manager disciplines an employee, an electronic copy of that discipline is transmitted to above-restaurant personnel and ultimately, on information and belief, to McDonald's headquarters in Chicago, where senior HR personnel are located. To the extent that a General Manager or above-restaurant manager seeks assistance in handling sexual harassment complaints, on information and belief, HR staff at McDonald's headquarters in Chicago advise the General Manager or above-restaurant manager.

140. Despite being on notice of systemic sexual harassment at its corporate owned and operated McOpCo restaurants, including those in Florida, McDonald's has failed to take the institutional action necessary to adequately address and prevent sexual harassment of its workers, instead relying on policies and procedures that actually encourage and foster sexual harassment, by holding neither harassers nor managers responsible for sexual harassment.

141. McDonald's policies and procedures facilitated and continue to facilitate a culture of sexual harassment and caused Plaintiffs and other class members to be subjected to sexual harassment, a hostile work environment, and often, retaliation.

142. The severe or pervasive harassment, and Defendants' failure to stop it, caused and continues to cause workers to suffer emotional distress, humiliation, indignity, outrage, embarrassment, and harm to reputation, among other things, including, for many workers, lost wages. McDonald's retaliation against workers who report sexual harassment that they or their

co-workers have suffered likewise has cause emotional distress, humiliation, indignity, outrage, embarrassment, and harm to reputation and professional advancement, among other things, including, for many workers, lost wages and/or termination.

143.     Upon information and belief, the rampant sexual harassment, hostile work environment, and retaliation, were so egregious that they drove some class members to leave, thereby constructively terminating the workers and causing them to lose their pay and benefits.

## CLASS ACTION ALLEGATIONS

144.     Plaintiffs Jamelia Fairley and Ashley Reddick bring this action pursuant to Federal Rule of Civil Procedure 23, on behalf of a proposed class (the "Class") consisting of all female employees who work or worked in a position below that of General Manager at Defendants' corporate owned and operated McOpCo McDonald's restaurants in Florida, for a time period from four years before the filing of this lawsuit to the time of trial ("the Class Period"). Plaintiffs reserve the right to amend the definition of the Class based on discovery or legal developments.

145.     Plaintiffs also bring this action on behalf of a Subclass, consisting of all female employees who work or worked in a position below that of General Manager at any of Defendants' corporate owned and operated McOpCo McDonald's restaurants in  Florida during the Class Period who, after complaining of or reporting sexual harassment, were subject to adverse employment action, including but not limited to, termination, discipline, reduction in hours, assignment to inferior shifts, or transfer to an inferior restaurant location (the "Retaliation Subclass").

146.     The Class has thousands of members, and the Retaliation Subclass has, on information and belief, over 100 members.  The members of the Class and Retaliation Subclass are so numerous that joinder of all members is impracticable.

37

147.     There are questions of law and fact common to the Class and Retaliation Subclass, central to the resolution of the case, and capable of class-wide resolution.  Answers to these common questions will advance this litigation significantly. Such common questions capable of generating common answers apt to drive this litigation include, but are not limited to, the following:

- whether McDonald's operates its corporate owned and operated McOpCo restaurants under a general pattern and practice of sex discrimination, by failing to prevent and remediate sexual harassment against female workers;

- whether McDonald's sexual harassment policies and procedures foster a culture in McDonald's corporate owned and operated McOpCo restaurants that allows and encourages potential harassers to act on their proclivities for harassment;

- whether McDonald's was on actual or constructive notice of the rampant sexual harassment at McDonald's corporate owned and operated McOpCo restaurants;

- whether McDonald's took appropriate systemic corrective actions to stop and prevent continued institutional harassment at its corporate owned and operated McOpCo restaurants;

- whether a hostile work environment existed and exists at McDonald's corporate owned and operated McOpCo restaurants;

- whether McDonald's policies and procedures did not prevent and instead encouraged retaliation against women who reported sexual harassment; and

- whether McDonald's is liable for the sexual harassment and/or retaliation suffered by employees at corporate owned and operated McOpCo restaurants.

148.     Plaintiffs' claims are typical of the claims of each member of the Class and Retaliation Subclass.  Plaintiffs are members of the Class and Subclass they seek to represent, and Plaintiffs were injured by the same wrongful conduct that injured other members of the Class and Subclass.

149.     Plaintiffs will fairly and adequately represent the Class and Retaliation Subclass. They have no conflicts of interest with the Class or Subclass, and have engaged counsel who are experienced with class action litigation, discrimination on the basis of sex and sexual harassment law, and the intersection of discrimination and class action law.

150.     Class Certification is appropriate with respect to Plaintiffs' request for injunctive relief under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class and Subclass as a whole.

151.     Class Certification is appropriate with respect to Plaintiffs' request for monetary relief under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class and Subclass predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

152.     Alternatively, the existence of a pattern and practice of sexual harassment and retaliation are properly certified under Federal Rule of Civil Procedure 23(c)(4) for the Class and Subclass because such claims present only common issues.

153.     Punitive damages liability may alternatively be certified under Federal Rule of Civil Procedure 23(b)(2) because such relief focuses on the conduct of Defendants and not the

individual characteristics of the Plaintiffs and are an allowable form of incidental monetary relief.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF TITLE VII, as amended, 42 U.S.C. § 2000e, *et seq.***
**(Sex Discrimination -- Sex Harassment and Hostile Work Environment)**

154.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as though set out here word for word.

155.     On May 10, 2019, Plaintiff Jamelia Fairley filed a timely charge of sex discrimination and retaliation on behalf of herself and all others similarly situated with the United States Equal Employment Opportunity Commission ("EEOC"), attached hereto as Exhibit A.  On January 13, 2020, the EEOC issued a dismissal and notice of right to sue, attached hereto as Exhibit B.

156.     On May 21, 2019, Plaintiff Ashley Reddick filed a timely charge of sex discrimination and retaliation on behalf of herself and all others similarly situated with the EEOC and Florida Commission, attached hereto as Exhibit C.  On January 13, 2020, the EEOC issued a dismissal and notice of right to sue, attached hereto as Exhibit D.

157.     McDonald's violated Title VII when it subjected Plaintiffs and class members to severe or pervasive sexual harassment and sex-based harassment that altered Plaintiffs' and class members' working conditions and created a hostile working environment.  McDonald's engaged in a company-wide and systematic policy, pattern, and/or practice of such unlawful sex discrimination by tolerating, condoning, and allowing sexual harassment of its women workers. McDonald's uniform nationwide policies, practices, and procedures together fostered an atmosphere in which employees felt free to harass other employees, with no fear of discipline, thus engendering even more harassment.

158.     Despite having actual and constructive knowledge of the sexual harassment and hostile work environment to which Plaintiffs and class members have been subjected, McDonald's failed to take immediate and appropriate corrective action to stop it.  Despite having actual and constructive knowledge that the sexual harassment and hostile work environment constituted a systemic, institutional problem, McDonald's failed to take systemic, institutional steps to remedy the sexual harassment and hostile work environment.

159.     By failing to promulgate an adequate policy against sexual harassment, failing to maintain an effective procedure for complaining about such conduct, and failing to otherwise inform employees that McDonald's will not tolerate sexual harassment in the workplace, McDonald's did not take reasonable care to prevent sexual harassment and did not provide a reasonable avenue of complaint about such conduct.

160.     McDonald's knew or should have known that its actions constituted unlawful sex discrimination, including sexual harassment and hostile work environment, and showed willful and/or reckless disregard for Plaintiffs' and class members' statutorily protected rights.

161.     The acts and omissions of McDonald's constitute a pattern and practice of discrimination against Plaintiffs and other members of the proposed Class.

162.     As a direct result of McDonald's discriminatory acts, Plaintiffs and the Class are entitled to damages including, but not limited to:

- Past and future lost wages and benefits;

- Compensation for past and future physical and emotional distress;

- Punitive damages;

- Attorneys' fees and costs; and

- Pre-judgment interest.

163.     As a direct result of McDonald's discriminatory acts, Plaintiffs and the Class are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

**COUNT II**
**VIOLATION OF TITLE VII, as amended, 42 U.S.C. § 2000e, *et seq.***
**(Retaliation for Reporting and Opposing Sex Discrimination and Harassment)**

164.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as though set out here word for word.

165.     Plaintiffs and members of the Retaliation Subclass engaged in protected activities under Title VII, including making internal complaints of sexual harassment, opposing sex discrimination, and/or filing charges with the EEOC.

166.     McDonald's violated Title VII when it took adverse employment actions against Plaintiffs and other class members with the purpose of retaliating against them because of their participation in protected activities and opposition to sex discrimination, including sexual harassment and hostile work environment.

167.     McDonald's knew or should have known that its actions constituted unlawful retaliation and showed willful and/or reckless disregard for Plaintiffs' and class members' statutorily protected rights.

168.     As a direct result of McDonald's retaliatory acts, Plaintiffs and the Retaliation Subclass are entitled to damages including, but not limited to:

- Past and future lost wages and benefits;

- Compensation for past and future physical and emotional distress;

- Punitive damages;

- Attorneys' fees and costs; and

- Pre-judgment interest.

169.     As a direct result of McDonald's discriminatory acts, Plaintiffs and the Class are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

## COUNT III
## VIOLATION OF FLORIDA CIVIL RIGHTS ACT, Florida Statutes 760
## (Sex Discrimination -- Sex Harassment and Hostile Work Environment)

170.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as though set out here word for word.

171.     On May 10, 2019, Plaintiff Jamelia Fairley filed a timely charge of sex discrimination and retaliation on behalf of herself and all others similarly situated with the EEOC, which was dual-filed with the Florida Commission on Human Relations ("Florida Commission"), attached hereto as Exhibit A.  The Commission failed to act on the charge within 180 days.

172.     On May 20, 2019, Plaintiff Ashley Reddick filed a timely charge of sex discrimination and retaliation on behalf of herself and all others similarly situated with the EEOC, which was dual filed with the Florida Commission, attached hereto as Exhibit C.  The Commission failed to act on the charge within 180 days.

173.     McDonald's violated the Florida Civil Rights Act when it subjected Plaintiffs and class members to severe or pervasive sexual harassment and sex-based harassment that altered Plaintiffs' and class members' working conditions and created a hostile working environment. McDonald's engaged in a company-wide and systematic policy, pattern, and/or practice of such unlawful sex discrimination by tolerating, condoning, and allowing sexual harassment of its women workers.  McDonald's uniform nationwide policies, practices, and procedures together fostered an atmosphere in which employees felt free to harass other employees, with no fear of discipline, thus engendering even more harassment.

174.    Despite having actual and constructive knowledge of the sexual harassment and hostile work environment to which Plaintiffs and class members have been subjected, McDonald's failed to take immediate and appropriate corrective action to stop it.  Despite having actual and constructive knowledge that the sexual harassment and hostile work environment constituted a systemic, institutional problem, McDonald's failed to take systemic, institutional steps to remedy the sexual harassment and hostile work environment.

175.    By failing to promulgate an adequate policy against sexual harassment, failing to maintain an effective procedure for complaining about such conduct, and failing to otherwise inform employees that McDonald's will not tolerate sexual harassment in the workplace, McDonald's did not take reasonable care to prevent sexual harassment and did not provide a reasonable avenue of complaint about such conduct.

176.    McDonald's knew or should have known that its actions constituted unlawful sex discrimination, including sexual harassment and hostile work environment, and showed willful and/or reckless disregard for Plaintiffs' and class members' statutorily protected rights.

177.    The acts and omissions of McDonald's constitute a pattern and practice of discrimination against Plaintiffs and other members of the proposed Class.

178.    As a direct result of McDonald's discriminatory acts, Plaintiffs and the Class are entitled to damages including, but not limited to:

- Past and future lost wages and benefits;

- Compensation for past and future physical and emotional distress;

- Punitive damages;

- Attorneys' fees and costs; and

- Pre-judgment interest.

179.     As a direct result of McDonald's discriminatory acts, Plaintiffs and the Class are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

### COUNT IV
### VIOLATION OF FLORIDA CIVIL RIGHTS ACT, Florida Statutes 760
### (Retaliation for Reporting and Opposing Sex Discrimination and Harassment)

180.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as though set out here word for word.

181.     Plaintiffs and members of the Retaliation Subclass engaged in protected activities under FCRA, including making internal complaints of sexual harassment, opposing sex discrimination, and/or filing charges with the Florida Commission.

182.     McDonald's violated FCRA when it took adverse employment actions against Plaintiffs and other class members with the purpose of retaliating against them because of their participation in protected activities and opposition to sex discrimination, including sexual harassment and hostile work environment.

183.     McDonald's knew or should have known that its actions constituted unlawful retaliation and showed willful and/or reckless disregard for Plaintiffs' and class members' statutorily protected rights.

184.     As a direct result of McDonald's retaliatory acts, Plaintiffs and the Retaliation Subclass are entitled to damages including, but not limited to:

- Past and future lost wages and benefits;

- Compensation for past and future physical and emotional distress;

- Punitive damages;

- Attorneys' fees and costs; and

- Pre-judgment interest.

185.     As a direct result of McDonald's discriminatory acts, Plaintiffs and the Class are also entitled to declaratory and injunctive relief, as set forth in detail in the Prayer for Relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and Subclass, pray for relief as follows:

A.     Certification of a Class and Subclass, as that class and subclass has been defined above;

B.     A declaration that McDonald's is violating or has violated the civil rights of Plaintiffs and the Class and Subclass they represent.

C.     An injunction requiring McDonald's to remedy the civil rights violations described herein, and to prevent future sexual harassment and subjection of its female employees to a sexually hostile work environment, by, among other things:

> i.   Forming a committee of McDonald's workers that, together with McDonald's and independent experts, will devise worker-centered and worker-led practices to prevent and stop sex harassment.

> ii.  Developing and implementing mandatory training focused on recognizing, preventing, and addressing sexual harassment at McDonald's.  The training should be informed by worker feedback, specifically by the feedback and input of survivors of sexual harassment at McDonald's, should be designed to specifically address the scenarios faced by McDonald's workers, and should take into account the working conditions and demographic background of McDonald's workforce.

> iii. Revising anti-harassment policies to ensure that the policies are based on worker and survivor feedback and input, make managers and

supervisory employees accountable for the work environment in their restaurant locations and the areas and regions they supervise, and are written in terms that a non-lawyer McDonald's worker would understand.

iv. Implementing a safe reporting mechanism including multiple channels for reporting sexual harassment, and adequately communicating that reporting mechanism to all workers.

v. Creating a protocol for investigation of employee complaints by an entity or individuals skilled in conducting and documenting workplace investigations, including trauma-informed ways of asking questions of individuals reporting harassment and methods of determining credibility that do not discount the accounts of sexual harassment victims.

vi. Establishing a remedial scheme that assures accountability for parties found to have engaged in harassment and managers who have failed to prevent harassment, and that assures a safe, harassment-free environment for those who report harassment.

vii. Adopting and implementing practices to ensure that employees who report harassment are not the subject of retaliation.

viii. Monitoring the number and type of complaints lodged at each restaurant and the resolution thereof.

ix. Monitoring the transfer of accused harassers from one restaurant to another.

      x. Establishing metrics by which restaurants and areas/regions will be evaluated for success in preventing and remedying sexual harassment and monitored for compliance, and establishing penalties for noncompliance.

     xi. Establishing metrics by which in-restaurant and above-restaurant managers will be evaluated for success in preventing and remedying sexual harassment and monitored for compliance, and establishing penalties for noncompliance.

D.     An order retaining jurisdiction over this action to ensure that McDonald's complies with such a decree.

E.     Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiffs and class members have sustained, past and future, together with interest, in an amount not less than $100,000 per class member, exceeding $500,000,000.

F.     An award of punitive damages that the Court or jury determines to be fair and sufficient to punish, penalize, and/or deter McDonald's.

G.     An award of reasonable attorneys' fees and costs; and

H.     Any other relief that the Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all those issues so triable as of right.

**Dated:** April 10, 2020

                                                 Respectfully submitted,

                                                 /s/Douglas M. Werman
                                                 One of Plaintiffs' Counsel

| | |
|---|---|
| Douglas M. Werman | Eve H. Cervantez* |
| Maureen A. Salas | Danielle Leonard* |
| Sarah J. Arendt | Elizabeth Vissers* |
| **WERMAN SALAS P.C.** | **ALTSHULER BERZON, LLP** |
| 77 W. Washington St., Ste 1402 | 177 Post Street, Suite 300 |
| Chicago, IL 60602 | San Francisco, CA 94108 |
| Tel: (312) 419-1008 | Tel: (415) 421-7151 |
| dwerman@flsalaw.com | ecervantez@altber.com |
| msalas@flsalaw.com | dleonard@altber.com |
| sarendt@flsalaw.com | evissers@altber.com |
| | |
| *Counsel for Plaintiffs* | *Counsel for Plaintiffs* |
| | *Pro hac vice motions forthcoming* |