IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMELIA FAIRLEY, and ASHLEY REDDICK, individually, and on behalf of all others similarly situated, | |
| Plaintiffs, | No. 20-cv-02273 |
| v. | Judge Franklin U. Valderrama |
| McDONALD'S CORPORATION, McDONALD'S USA, LLC, and McDONALD'S RESTAURANTS OF FLORIDA, INC., | |
| Defendants. | |

SEALED MEMORANDUM OPINION AND ORDER[1]

Plaintiffs Jamelia Fairley (Fairley) and Ashley Reddick (Reddick) (collectively,

Plaintiffs) are employed or were employed at a McDonald's restaurant in Florida.[2]

---

[1] Portions of the parties' briefs and exhibits were filed under seal. Because this Order may contain privileged information that was submitted to the Court under seal, the Court issues its Order under seal. As the Court stated in its Minute Entry of 8/8/2024, the Court is in receipt of the parties' joint submission regarding documents provisionally filed under seal, and the Court declined to unseal any disputed documents until ruling upon the pending substantive motions. R. 197 (citing *Levitin v. N.W. Community Hosp.*, 2016 WL 4179088, at *3 (N.D. Ill. Aug. 8, 2016) ("Once the district court has issued its decision on the pending summary judgment motions, this Court will be well-positioned to determine exactly what information underpinned the ruling and in turn what shall and shall not remain under seal."). Based on the Court's Opinion, the Court directs the parties to file, by January 14, 2026, an updated joint submission regarding documents provisionally filed under seal, accounting for the Court's reasoning and rulings. The status report should also explain what (if any) redactions are needed in the text of the Opinion, and why (bearing in mind the strict standard against secret filings, *see generally Mitze v. Saul*, 968 F.3d 689 (7th Cir. 2020)). That position statement may be filed under seal. After considering the parties' positions regarding materials to remain under seal, as well as the parties proposed redactions, the Court will issue an Order regarding the sealed materials and will unseal this Opinion (if no redactions are requested/warranted) or issue a public, redacted version of the Opinion.

Plaintiffs, individually and on behalf of a class of similarly situated individuals, sued McDonald's Corporation, McDonald's USA, LLC (McDonald's USA), and McDonald's Restaurants of Florida, Inc. (McDonald's of Florida) (collectively, McDonald's), asserting counts for sex harassment, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000(e), *et seq.* and the Florida Civil Rights Act, Fla. Stat. Ann. § 760.[3] R.[4] 18, FAC.

Before the Court are Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23 (R. 140, Mot. Certify), McDonald's motion to exclude the testimony, reports, and opinions of Dr. Louise Fitzgerald (R. 162, Mot. Exclude Fitzgerald), and Plaintiffs' motion to exclude the testimony, reports, and opinions of Dr. Joanne McFadden Papinchock (R. 179, Mot. Exclude Papinchock). For the reasons stated below, the Court grants in part and denies in part McDonald's motion to exclude the testimony, reports, and opinions of Dr. Fitzgerald; grants in part and denies in part Plaintiffs' motion to exclude the testimony, reports and opinions of Dr. Papinchock; and denies Plaintiffs' motion for class certification.

---

[2]While the facts giving rise to this action occurred in Florida, venue is proper in the Northern District of Illinois pursuant to 42 U.S.C. § 200e-5(f)(3) because the allegedly unlawful practices were developed and implemented at McDonald's headquarters, located in Chicago, Illinois. FAC ¶ 20.

[3]Florida's equivalent to Title VII, the Florida Civil Rights Act (FCRA), contains an identical prohibition on sex, pregnancy, and race discrimination. *See Diaz v. Florida*, 219 F. Supp. 3d 1207, 1214 (S.D. Fla. 2016); *Evans v. St. Lucie County Sch. Dist.*, 2018 WL 5807661, at *5 (S.D. Fla. Nov. 6, 2018) ("Florida's Civil Rights Act (FCRA) mirrors the federal Civil Rights Act, and uses the same analysis.").

[4]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

## Background

Defendant McDonald's Restaurants of Florida, Inc. operates company owned-and-operated McDonald's-brand restaurants (McOpCos) in the State of Florida and employs all restaurant-level employees at Florida McOpCos. Mot. Certify at 1. Defendant McDonald's USA, LLC licenses the McDonald's brand and the right to operate McOpCo restaurants in Florida to McDonald's Restaurants of Florida, Inc. *See id.* at 1–2. Defendant McDonald's Corporation is the parent company of McDonald's USA, LLC. *Id.*

Plaintiffs Fairley and Reddick work or have worked as a crew member or crew trainer at the McOpCo restaurant known as "South French." Mot. Certify at 13. Fairley is currently employed, while Reddick was terminated in 2018. *See id.* at 15. Both Plaintiffs allegedly experienced incidents of sexual harassment while working at South French. Fairley alleges that she was subject to verbal harassment, offensive statements, and unwanted physical touch. *Id.* at 13–15. Fairley complained to various managers but maintains that no disciplinary action resulted. *See id.* Reddick similarly alleges that McDonald's failed to adequately protect her from unwanted sexual harassment. *Id.* at 15. Namely, Reddick asserts that she was the victim of multiple instances of explicit verbal harassment and inappropriate physical touch. *See id.* at 15. Like Fairley, Reddick maintains that she reported the harassment to multiple managers, to no avail. *See id.*

Plaintiffs assert that their experiences are typical of a putative class of women employed by Florida McOpCo restaurants. In support, Plaintiffs point to Florida

McOpCo's uniform sexual harassment policies and sexual harassment trainings, contending that these policies and trainings contain key flaws, both in the language used as well as in their implementation and enforcement. *See* Mot. Certify at 5–7. Moreover, Plaintiffs allege, McOpCo's sexual harassment reporting procedures are inadequately enforced and lack accountability, contributing to an environment in which women are routinely harassed without due consequence for the harassers, perpetuating a cycle of implicitly tolerated harassment. *Id.* at 7–9. Plaintiffs next point to McOpCo's sexual harassment investigation training and procedures, which they argue McDonald's "systematically fails to enforce" and which lack critical accountability measures. *Id.* at 9–11. Finally, Plaintiffs point to insufficient disciplinary practices, arguing that McDonald's lacks clear standards with respect to discipline for sexual harassment. *Id.* at 11–13. As a result of McOpCo's ineffective policies, training, reporting, and disciplinary procedures, Plaintiffs allege that McOpCo exhibits a pattern and practice of tolerating systemic sexual harassment.

In addition to the specific instances of harassment alleged by Plaintiffs Fairley and Reddick, Plaintiffs point to ten "sample stores,"[5] which they contend showcase the ubiquitous nature of sexual harassment at Florida McOpCo restaurants and McDonald's implicit tolerance of the same. *See id.* at 17–22. Plaintiffs' allegations are not confined to the ten sample stores, however. Rather, they go further, contending that "female crew at all Florida McOpCo restaurants are at risk" due to McDonald's

---

[5]These sample stores are South French, Four Corners, Ovation, Hobo Junction, Park Boulevard, Ellenton, Osceola Village, Debary, 14th Street, and Gibsonia. *See* Mot. Certify at 17–22. Plaintiffs point to specific allegations of harassment and alleged tolerance of such harassment at each of the ten sample stores. *See id.*

lack of "an effective harassment prevention and remediation program, corporate leadership that espouses anti-harassing behaviors, and reliable accountability measures." *Id.* at 26–27. McDonald's deliberate ignorance of sexual harassment and failure to adequately remedy the issue, argue Plaintiffs, warrants class certification. S*ee id.* at 23.

Plaintiffs, individually and on behalf of a class of similarly situated individuals, sued McDonald's asserting counts for sexual harassment, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000(e), *et seq.* and the Florida Civil Rights Act, Fla. Stat. Ann. § 760. FAC.

There are three motions before the Court: Plaintiffs' motion for class certification; McDonald's motion to exclude the testimony, reports and opinions of Plaintiffs' expert, Dr. Louise Fitzgerald; and Plaintiffs' motion to exclude the testimony, reports and opinions of McDonald's retained expert, Dr. McFadden Papinchock. Because the parties' briefs related to the class certification motion rely, in part, on their respective expert testimony, the Court addresses McDonald' motion to exclude Dr. Fitzgerald and Plaintiffs' motion to exclude Dr. Papinchock before addressing the motion for class certification. *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1028 (7th Cir. 2018) (a district court "must conclusively rule on any challenge

to the expert's qualifications or submissions prior to ruling on a class certification motion, if the expert testimony is critical to class certification.") (cleaned up).[6]

## I.    Daubert Motions

Rule 702[7] of the Federal Rules of Evidence governs the admissibility of expert testimony. Fed. R. Evid. 702; *Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024). Rule 702 allows the admission of testimony by an expert—that is, someone with the requisite "knowledge, skill, experience, training, or education"—to help the trier of fact "understand the evidence or [ ] determine a fact in issue." Fed. R. Evid. 702. An expert witness is permitted to testify when (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id*. The expert's proponent bears the burden of proving by a preponderance of the evidence the expert's testimony satisfies Rule 702. *See United States v. Saunders*, 826 F.3d 363, 368 (7th Cir. 2016).

The district court serves as the gatekeeper who determines whether proffered expert testimony is reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). "[T]he key to the gate is not the ultimate correctness of the expert's conclusions," rather, "it is the soundness and care with which the expert arrived at her opinion[.]" *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th

---

[6]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. See Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

[7]In 2023, Rule 702 was amended, in part, to clarify and emphasize that the "sufficiency of an expert's basis[] and the application of the expert's methodology" are questions of admissibility, not weight. Fed. R. Evid. 702 Advisory Committee Notes to 2023 Amendments.

Cir. 2015) (cleaned up). District courts have broad discretion in determining the admissibility of expert testimony. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012). In exercising their discretion, Rule 702 and *Daubert* require courts to engage in a three-step analysis prior to admitting expert testimony. *EEOC v. AutoZone, Inc.*, 2022 WL 4596755, at *13 (N.D. Ill. Sept. 30, 2022) (cleaned up). Courts "must determine (1) whether the witness is qualified; (2) whether the expert's methodology is scientifically reliable; and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

The focus of the district court's *Daubert* inquiry "must be solely on the principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. Whether expert testimony or evidence is reliable "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). As the Seventh Circuit has noted, even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (cleaned up).

## A. Dr. Fitzgerald

In their motion for class certification, Plaintiffs rely in part on the expert report of Dr. Fitzgerald, an industrial psychologist and licensed clinical psychologist and Professor Emeritus of Psychology and Gender and Women's Studies at the University of Illinois at Urbana-Champaign. *See* R. 138-60, Expert Report of Dr. Fitzgerald

(Fitzgerald Rep.) at 2. Dr. Fitzgerald opines that McDonald's common policies and procedures for the prevention and remediation of sexual harassment are inconsistent with widely endorsed evidence-based practices in twelve areas: (1) the sexual harassment policy is not written in language likely to be understood by the average McDonald's worker; (2) the policy is not sufficiently emphasized and enforced; (3) McDonald's is not enforcing consistent adherence to its reporting procedures, particularly the requirement that managers escalate sexual harassment complaints; (4) employees are not reporting sexual harassment complaints through alternate reporting options; (5) sexual harassment training for crew members is not consistent with EEOC guidance; (6) sexual harassment training for managers is insufficient; (7) investigation and thoroughness is poor; (8) the HR Consultants charged with investigating sexual harassment are not making credibility determinations; (9) McDonald's maintains no specific guidelines for discipline to be imposed on those found to have violated the sexual harassment policy; (10) McDonald's fails to inform complainants of the outcomes of the investigation; (11) there are problems with McDonald's recordkeeping and documentation practices; and (12) General Managers are not held accountable when they fail to escalate complaints of sexual harassment. *See generally id.*

Because McDonald's does not challenge Dr. Fitzgerald's qualifications, the Court need not address them. *See United States v. Moore*, 521 F.3d 681, 685 (7th Cir. 2008) ("A judge is not obliged to look into the questions posed by Rule 702 when neither side requests or assists."). Instead, McDonald's moves to bar Dr. Fitzgerald's

opinions for two reasons: (1) her report and testimony are not relevant because they do not help the factfinder; and (2) her opinions are not reliable because (a) they are not based on sufficient facts or data and (b) she did not use reliable principles and methods.[8] *See generally* Memo. Exclude Fitzgerald. The Court addresses each argument in turn.

## 1. Relevance

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Evidence that is not relevant is inadmissible. Fed. R. Evid. 402. "An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). Expert testimony, however, "does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Sanders v. City of Chi. Heights*, 2016 WL 4398011, at *4 (N.D. Ill. Aug. 18, 2016) (cleaned up). "Expert testimony does not assist the trier of fact where the opinions just espouse common sense." *Nelson v. Pace Suburban*, 2022 WL 1401529, at *3 (N.D. Ill. Mar. 21, 2022).

McDonald's argues that the Court should exclude Dr. Fitzgerald's testimony because it will not aid the trier of fact to evaluate the issues at the heart of this case: whether a policy or practice of sex discrimination exists at Florida McOpCo

---

[8]Although McDonald's separates its arguments into the sufficiency of the facts and data and the reliability of the methods applied by Dr. Fitzgerald, the Court finds that the two arguments overlap in large part, and thus analyzes them together.

restaurants. Memo. Exclude Fitzgerald at 4–6 (citing, *inter alia*, *Van v. Ford Motor Co.,* 332 F.R.D. 249 (N.D. Ill. 2019)). McDonald's also posits that, to the extent Plaintiffs seek to have Dr. Fitzgerald offer testimony regarding sexual harassment generally, this testimony would be unhelpful to the jury because sexual harassment in the workplace is a common issue that does not require expert testimony. R. 199, Reply Exclude Fitzgerald at 3 (citing *Loecker v. Bd. of Trustees for Colo. Mesa Univ.*, 671 F. Supp. 3d 1217, 1222 (D. Colo. 2023); *Childers v. Trustees of the Univ. of Penn.*, 2016 WL 1086669, at *6 (E.D. Pa. Mar. 21, 2016)).

McDonald's additionally asserts that Dr. Fitzgerald's testimony would be unhelpful to the jury for the independent reason that her opinions depart from the standard applicable to Title VII sexual harassment cases. Memo. Exclude Fitzgerald at 6. The way McDonald's sees it, Dr. Fitzgerald "carefully framed her many opinions in terms of what has been *alleged* by employees as evidencing the 'organizational climate' at Florida McOpCo restaurants," and in so doing, has "refrained from conducting an analysis as to the magnitude of any alleged sexual harassment issues there, or from conducting any independent inquiry." *Id*. Therefore, McDonald's concludes that Dr. Fitzgerald avoids offering any opinions that are relevant to determining whether McDonald's violated Title VII as to any individual, let alone on a class-wide basis. *Id*.

Plaintiffs predictably disagree, insisting that Dr. Fitzgerald's testimony will aid the jury in determining "whether McDonald's has a pattern or practice of tolerating sexual harassment by failing to take effective steps to prevent and

remediate it." R. 177, Resp. Mot. Exclude Fitzgerald at 10 (citing *Nelson*, 2022 WL 1401529, at *2). From Plaintiffs' perspective, Dr. Fitzgerald's analysis of McDonald's policies "will assist the jury in determining whether McDonald's uniform policies and procedures for prevention and remediation of sexual harassment were deficient and therefore support a finding that a pattern or practice of tolerating harassment exists at McDonald's Florida McOpCo restaurants." *Id.* at 11.

As an initial matter, McDonald's does not identify each opinion separately but instead attacks all of Dr. Fitzgerald's opinions wholesale, offering examples that support its arguments but which the Court understands are not the only opinions with which McDonald's takes issue. *See, e.g.*, Memo. Exclude Fitzgerald at 6 (Dr. Fitzgerald "carefully framed her many opinions in terms of what has been *alleged* by employees . . . .") (emphasis in original). This approach does not suffice. Dr. Fitzgerald has authored an 83-page report containing numerous opinions. If McDonald's maintains that an opinion is not admissible, then it is incumbent upon McDonald's to identify that opinion and advance the basis for its exclusion. Since McDonald's failed to do so, the Court limits its analysis to those specific objections advanced by McDonald's.

Dr. Fitzgerald's expert testimony centers around McDonald's policies and procedures for the prevention and remediation of sexual harassment, and how those policies deviate from evidence-based practices. This testimony is both relevant and helpful to the jury. *See Equal Emp. Opportunity Comm'n & Bailey*, 2016 WL 5796890, at *9 (N.D. Ill. Sept. 30, 2016) (finding expert's analysis of whether defendant's

11

policies complied with industry standards to be helpful to the trier of fact in Title VII action); *Nelson*, 2022 WL 1401529, at *3 (finding that expert's testimony on discrimination would be helpful to the jury because it "distill[s] complex matters of social psychology"). An expert may offer an opinion "describing sound professional standards and identifying departures from them." *Jimenez v. City of Chicago*, 732 F.3d 719, 721 (7th Cir. 2013) (cleaned up); *see also W. By & Through Norris v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997). The only cases McDonald's cites for exclusion of the testimony are both out-of-Circuit and factually distinguishable, as they do not involve expert testimony on the effectiveness of sexual harassment policies—which are not automatically within a jury's purview—but rather gender and racial discrimination and stereotyping, which are matters more likely to be within a jury's common-sense. *See Loecker*, 671 F. Supp. 3d at 1222 (finding that expert's testimony on gender and race discrimination was not beyond jury's comprehension); *Childers*, 2016 WL 1086669, at *6 (excluding expert's testimony pertaining to gender stereotyping).

McDonald's argument that Dr. Fitzgerald's opinions depart from the standard applicable to Title VII sexual harassment cases fares no better. Memo. Exclude Fitzgerald at 6 (citing *E.E.O.C v. Dial Corp.*, 2002 WL 31061088, at *4–5 (N.D. Ill. Sept. 17, 2002)). Specifically, McDonald's takes issue with Dr. Fitzgerald's statement that she "make[s] no judgment about the veracity of the witnesses or complainants [and] [her] opinions are based on the facts as reported by the witnesses." *Id.* (quoting Dr. Fitzgerald Rep. at 29 n.67). But contrary to McDonald's contention, an expert

"cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact." *Goodwin v. MTD Prods.,* 232 F.3d 600, 609 (7th Cir. 2000). However, an expert may give an opinion based upon factual assumptions even where the fact is disputed, so long as there is evidence to support such facts. *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006); *Andersen v. City of Chicago*, 2020 WL 1848081, at *4 (N.D. Ill. Apr. 13, 2020) (collecting cases). "There is a critical distinction between an expert testifying that a disputed fact actually occurred or that one witness is more credible than another and an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine. The former is manifestly improper, the latter is not." *Richman*, 415 F. Supp. 2d at 942. While Dr. Fitzgerald consequently may not testify that McDonald's did not comply with Title VII during the period in question, she does not explicitly do so in her report. The Court therefore cannot conclude that portions of her report may be excluded for this reason.

McDonald's arguments concerning Dr. Fitzgerald's failure to address the "sample stores" is also unavailing. McDonald's posits that to the extent Plaintiffs rely on Dr. Fitzgerald's report or testimony to imply certain outcomes; she did nothing to connect any alleged deficiencies in McDonald's policies or practices to the alleged prevalence of harassment at Florida McOpCo restaurants. Memo. Exclude Fitzgerald at 6. From McDonald's point of view, Dr. Fitzgerald does not analyze the prevalence of harassment or perceptions of employees at the ten "sample stores" Plaintiffs claim exemplify a hostile work environment. *Id*. at 5, 15. But this is nothing short of a straw

man argument, as Plaintiffs have not retained Dr. Fitzgerald to offer any opinion regarding the prevalence of sexual harassment at any specific McOpCo. *See generally* Dr. Fitzgerald Rep. Instead, Dr. Fitzgerald's role is to compare McDonald's sexual harassment policies against widely endorsed evidence-based practices. As such, Plaintiffs assert—and the Court agrees—that Dr. Fitzerald need not have conducted separate analyses into the sample stores to form her conclusions about the policies in question. *See* Resp. Mot. Exclude Fitzgerald at 9 n.4. Accordingly, the Court finds Dr. Fitzgerald's testimony relevant and helpful to the trier of fact.

Finally, McDonald's asserts that Plaintiffs, in their motion for class certification, improperly rely on Dr. Fitzgerald as a fact witness. *See* Memo. Exclude Fitzgerald at 5. Not so, counter Plaintiffs, as they cite Dr. Fitzgerald's reports and the underlying evidence to support the facts. *See* Resp. Mot. Exclude Fitzgerald at 11. The Court agrees with Plaintiffs that McDonald's argument misses the mark, as Plaintiffs do not use Dr. Fitzgerald as a fact witness. Notably, McDonald's fails to cite any authority in support of this argument and has thus waived it. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). No matter, as the mere fact that Dr. Fitzgerald provides some context and background regarding sexual harassment does not render her a fact witness. That said, Dr. Fitzgerald is barred from offering undisclosed opinions under the guise of context for her opinions.

### 2. Reliability

McDonald's next contends that Dr. Fitzgerald's testimony should be excluded as unreliable because it is not based on sufficient facts or data and Dr. Fitzgerald did not use any reliable, scientific methodology. Memo. Exclude Fitzgerald at 6.

Rule 702 requires the trial judge to ensure that all expert testimony or evidence admitted is not only relevant but reliable. *Daubert*, 509 U.S. at 589. "Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). As the Seventh Circuit has noted, even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (cleaned up). Rule 702 requires a connection between the data employed and the opinion offered; it is the opinion connected to existing data "only by the *ipse dixit* of the expert," that is properly excluded under Rule 702." *Manpower*, 732 F.3d at 806 (cleaned up).

To this end, courts must ensure that a proposed expert's methodology is scientifically valid and that her conclusions are "based on sufficient facts or data." Fed. R. Evid. 702(b). In determining whether an expert's methods are reliable, courts look to factors including, but not limited to, "(1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a

known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact. *Smith*, 215 F.3d at 718. "The critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data only by the *ipse dixit*[9] of the expert that is properly excluded." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (cleaned up).

The Court begins with the materials on which Dr. Fitzgerald relied to form her opinions. Dr. Fitzgerald reviewed all of McDonald's sexual harassment complaints, documents, policies, trainings, and posters produced before the close of discovery. She has also reviewed the deposition transcripts of many witnesses, including the 30(b)(6) witnesses. Turning to Dr. Fitzgerald's methodology—which McDonald's incorrectly argues that she did not substantively discuss (Memo. Exclude Fitzgerald at 10–11)— Dr. Fitzgerald explains her methodology as follows:

> I begin by analyzing McDonald's harassment prevention policies, including their distribution and the company's methods of communicating them; I then examine the complaint procedures and their evolution, and the training given to both crew members and restaurant managers. I next review McDonald's harassment investigation protocols, both as they are laid out in policy and training documents and as it appears they are actually implemented on the ground; and then I examine the company's corrective action and disciplinary process. I conclude with some thoughts on accountability measures, including an examination of McDonald's People

---

[9]*Ipse dixit* is "[s]omething asserted but not proved." IPSE DIXIT, Black's Law Dictionary (12th ed. 2024).

Brand Standards.

Dr. Fitzgerald Rep. at 20. She then explains that she examines these topics from three

perspectives:

> [F]irst, I review what behavioral science, relevant professional authorities, and governmental agencies propose as the most effective methods of addressing each area; second, I examine McDonald's official stance on these issues, as laid out in its policies and procedures; and finally, to the degree possible, I examine what actually goes on "on the ground" in Florida McOpCo restaurants.

*Id.*

The Court now turns to McDonald's specific arguments for exclusion of Dr.

Fitzgerald's opinions due to their alleged lack of reliability.

First, McDonald's argues that Dr. Fitzgerald relies "exclusively on information

curated or prepared by Plaintiffs' counsel and often admits facts and/or documents

she did not seek." Memo. Exclude Fitzgerald at 7. According to McDonald's, the biased

and unrepresentative testimony of putative class members, along with other

documents prepared by counsel, is not sufficient data to form the basis of a reliable

expert opinion. *Id.* at 8 (citing *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1025–

26 (N.D. Ill. 2011)). The Court disagrees that Dr. Fitzgerald's reliance on these

materials make all of her opinions unreliable. Based on these materials, along with

her review of the proper procedures to prevent and respond to sexual harassment,

Dr. Fitzgerald may opine on whether and to what extent McDonald's procedures and

responses are consistent with those proper procedures. It is of no import that the

documents she relied upon were provided to her by Plaintiffs' counsel and were

collected during discovery. *See Nelson*, 2022 WL 1401529, at *2 (explaining that

17

expert "reviewed relevant social psychology literature on workplace discrimination along with deposition transcripts and [defendant's] disciplinary data, both provided to her by the Plaintiffs"). It is enough for her to have analyzed McDonald's policies, in conjunction with other sources, for her to form her conclusions *as to the efficacy of those policies*.

McDonald's citation to *Obrycka v. City of Chicago* does not change that conclusion. In *Obrycka*, the expert's testimony was excluded where he relied "solely" on "skeletal outlines" provided to him by plaintiffs' counsel. 792 F. Supp. 2d at 1025–226. The court found that "there was no evidence that [the expert] investigated the veracity of the materials Plaintiffs' counsel to provided to him," and that he "failed to explain how he arrived at [his] conclusions, or cite material(s) he relied upon, other than the outlines prepared for him in this litigation by Plaintiffs' counsel." *Id.* In contrast to the expert in *Obrycka*, Dr. Fitzgerald read the full deposition transcripts of many of the witnesses, and when she did read a summary of a transcript, she then reviewed the full transcripts for additional detail. *See* Resp. Exclude Fitzgerald at 15 (citing Resp. Exclude Fitzgerald, Ex. A, Fitzgerald Dep. Tr. 50:4–51:5; 52:2–13). Dr. Fitzgerald additionally relied on documents produced by *both* parties in discovery, specifying that her opinions "are primarily based on McDonald's own documents." *Id.* at 15. Indeed, and in further divergence from the expert in *Obrycka*, Dr. Fitzgerald provides citations to such evidence throughout her analyses and conclusions, providing the Court with the vital "link between the facts or data the expert has

worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

While true that expert opinions can be barred when the expert ignores significant relevant evidence, the Court finds this not to be the case here. *See, e.g.*, *Empress Casino Joliet Corp. v. Johnston*, 2014 WL 6735529, at *11 (N.D. Ill. Nov. 28, 2014). The weight (if any) that Dr. Fitzgerald gave to various facts in forming her opinions may provide fodder for cross-examination, but it is not a basis to exclude the testimony. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also Manpower*, 732 F.3d at 809 ("Our system relies on cross-examination to alert the jury to the difference between good data and speculation.") (cleaned up). Therefore, the Court declines to bar Dr. Fitzgerald's opinions wholesale based on the materials upon which she relied.

McDonald's next takes aim at Dr. Fitzgerald's opinion regarding the organizational climate at McDonald's. Dr. Fitzgerald, submits McDonald's, did not collect any data to study this organizational climate. Memo. Exclude Fitzgerald at 6–7. Nor did she interview or survey any McDonald's employees. *Id.* at 7. Additionally, according to McDonald's, Dr. Fitzgerald concedes that while there were "multiple survey-related methods" that she could have used to measure the "organizational climate of Florida McOpCo restaurants," she declined to do so. *Id.* at 11. From McDonald's perspective, Dr. Fitzgerald has not identified any "legitimate technique

underlying her conclusory analysis of the organizational climate" at McDonald's. *Id*.
As such, her opinion falls short of the requirements of Rule 702.

The Court agrees that to the extent Dr. Fitzgerald purports to offer an opinion
regarding the organizational climate at McDonald's, Plaintiffs have failed to establish
a reliable methodology for any such opinion. True, as Plaintiffs point out, Dr.
Fitzgerald relies on "all of McDonald's sexual harassment complaints, documents,
policies, training and posters produced before the close of discovery." Resp. Exclude
Fitzgerald at 14. And it is also the case that Dr. Fitzgerald reviewed the declarations
of 40 putative class members, but nowhere does she opine that this number of
declarants is a representative sample. On the contrary, she testified that "these
people are not representative, so whatever I said about them or was able to learn
about them, cannot be generalized to McOpCo in any way. Ex. A, Fitzgerald Dep.
47:20–49:16. Notably, Plaintiffs concede that Dr. Fitzgerald does not rely on the
declarations and deposition testimony of Plaintiffs and putative class members as
"representative" of all putative class members. Resp. Exclude Fitzgerald at 14. At
bottom, this failure, contrary to Plaintiffs' contention, does not go to the weight of Dr.
Fitzgerald's testimony, but to its admissibility. *See Dial Corp.*, 2002 WL 31061088,
at *8 n.7 (excluding Dr. Fitzgerald's opinions and finding that, despite her admission
that she could not generalize based on the sample size, her report "contain[ed]
statements that call[ed] her commitment to that position into question" where she
opined on the common experience of "the women who worked" at the company).
Accordingly, the Court excludes any opinions of Dr. Fitzgerald regarding the

organizational climate of McDonald's where such opinions are based only on Dr. Fitzgerald's review of declarations or depositions (or summaries thereof) of putative class members.

McDonald's next challenges Dr. Fitzgerald's opinions regarding McDonald's sexual harassment policies and practices and their alleged deficiencies vis-à-vis widely endorsed evidence-based practices. From McDonald's point of view, these opinions are also based on insufficient and unreliable data. Memo. Exclude Fitzgerald at 8. As stated above, to the extent McDonald's does not identify a specific opinion, but rather attacks Dr. Fitzgerald's report as a whole, the Court finds such an approach impermissible. It therefore again limits its analysis to those specific objections advanced by McDonald's. One of the specific opinions attacked by McDonald's is Dr. Fitzgerald's opinion that escalations of sexual harassment allegations are inadequate. *Id.* Such an opinion is not based on sufficient data, argues McDonald's, because Dr. Fitzgerald fails to quantify the underlying rates on non-escalation to support this opinion. *Id.* In response, Plaintiffs explain that "calculating the number of complaints made to managers that were not escalated is not possible in this case." Resp. Exclude Fitzgerald at 13. But Plaintiffs, as the proponent of the expert, must show that the methodology employed by the expert was reliable. *See United States v. Saunders*, 826 F.3d. 363, 368 (7th Cir. 2016). Plaintiffs fail to do so. Accordingly, Dr. Fitzgerald may not opine that escalations of sexual harassment allegations at McDonald's are inadequate.

McDonald's also attacks Dr. Fitzgerald's opinion that McOpCo managers are not held accountable for failure to escalate complaints. Memo. Exclude Fitzgerald at 8. The problem with this opinion, in McDonald's view, is that Dr. Fitzgerald fails to quantify either the rates of discipline or the effectiveness of discipline when issued with respect to its impact on the organizational climate. *Id.* The Court agrees with McDonald's that this opinion is too broad for the reasons discussed above regarding escalating complaints. However, as Plaintiffs point out, Dr. Fitzgerald also opines that, "[a]lthough GMs and other managers are directed to report . . . complaints to the HR Representative/People Supervisor, there is no accountability system in place to ensure that this happens. This is a critical issue." Resp. Exclude Fitzgerald at 13 n.7 (quoting Dr. Fitzgerald Rep. at 29). For the reasons discussed in more depth below, the Court finds that, where Dr. Fitzgerald's opinions are based on her review of McDonald's policies and how such policies are deficient, such opinions are reliable and admissible. Accordingly, Dr. Fitzgerald may not testify broadly that McOpCo managers are not held accountable for failure to escalate complaints, but she may testify that no accountability system is in place regarding the escalation of complaints.

Next up is Dr. Fitzgerald's opinion that the policies applicable to Florida McOpCo are not readable. Memo. Exclude Fitzgerald at 8–9. Again, McDonald's faults her failure to quantify either the reading level of the employee population receiving the policies or the employee population's actual understanding of the policy. *Id.* at 9. Plaintiffs counter that Dr. Fitzgerald's expert testimony centers around

McDonald's policies and procedures for the prevention and remediation of sexual harassment, and how those policies deviate from evidence-based practices, including "widely publicized, clear, and readable policies." Resp. Exclude Fitzgerald at 5 n.2, 12. The Court finds that Dr. Fitzgerald does just that as to the readability of McDonald's policies. *See* Dr. Fitzgerald Rep. at 22–24. Dr. Fitzgerald does not opine on the reading level of the average McDonald's employee—other than to state that McDonald's hires teenagers and does not require employees to have a college diploma—and instead testifies as to the objective readability of McDonald's policies and procedures. *See id.* at 24 (citing 2022 McOpCo Job Descriptions, McDonalds_Fairley_0011230-37; Ex. 166, Operations & Training Manual dated July 2020, McDonalds_Fairley_0003376-470, at 63–64). Moreover, Dr. Fitzgerald states that "regardless of literacy level," people read online materials (like McDonald's "web-based 'homes'" for their policies and procedures") differently than they do printed text, as "[r]esearch shows that people scan web pages and only read about 18% of what's on the page." *Id.* All in all, the Court finds her opinion on the readability of McDonald's policies to be admissible. *See, e.g.*, *Jimenez*, 732 F.3d at 721. Dr. Fitzgerald's failure to quantify the reading level of McDonald's employees goes to the weight, not the admissibility of the opinion.

McDonald's also takes issue with Dr. Fitzgerald's opinions about the inadequacy of the frequency and content of sexual harassment training that Florida McOpCo employees receive. Memo. Exclude Fitzgerald at 9. McDonald's contends that Dr. Fitzgerald again fails to offer any empirical research or independent study,

to support that an increase in the frequency or content would reduce the incidence of sexual harassment at Florida McOpCo restaurants. *Id.* Plaintiffs, on the other hand, assert that empirical research is not a prerequisite to the admission of expert testimony. Resp. Exclude Fitzgerald at 12–13 (citing *Phillips*, 364 F. Supp. 2d at 743; *Van*, 332 F.R.D. at 269; *Nelson*, 2022 WL 1401529, at *4)). The Court agrees with Plaintiffs.

To the extent that McDonald's attacks Dr. Fitzgerald's methodology generally, the Court finds that methodologies like the one Dr. Fitzgerald describes and utilizes have been found to be reliable. *See Richman*, 415 F. Supp. 2d at 945–46 ("There is no doubt that under Rules 702 and 704 an expert may testify about applicable professional standards and the defendants' performance in light of those standards."); *cf. Norris ex rel. West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997) (explaining that an expert is permitted to testify about "professional standards" and "departures from [those standards]"). The Court additionally disagrees with McDonald's contention that Dr. Fitzgerald's decision not to conduct independent surveys or engage in her own data collection warrants exclusion. *See Nelson*, 2022 WL 1401529, at *2 ("And while Defendants argue that Dr. Peery's analysis should have utilized in-person interviews and certain psychological tests, that is a matter of weight, not admissibility, and is better left for cross-examination."); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005) ("[A]n expert need not actively conduct his or her own tests to have a valid methodology.").

To summarize, Dr. Fitzgerald may not offer opinions on: McOpCo's

organizational climate based solely on Dr. Fitzgerald's review of declarations or depositions of putative class members; the adequacy or inadequacy of escalations of sexual harassment allegations at McDonald's; or accountability or lack thereof of McOpCo managers for failure to escalate complaints. Despite these specific exclusions, the Court finds that McDonald's attack on Dr. Fitzgerald's methodology to be mostly misplaced.

All in all, with the exception of the three opinions identified above, the Court finds that Dr. Fitzgerald satisfies the *Daubert* analysis. Namely, she is qualified, she uses reliable methodology, and her testimony will assist the trier of fact understand the evidence or determine a fact in issue. *See AutoZone, Inc.*, 2022 WL 4596755, at *13. Accordingly, the Court grants in part and denies in part McDonald's motion to exclude the testimony, reports, and opinions of Dr. Fitzgerald.

The Court now turns to Plaintiffs' motion to exclude the testimony of McDonald's expert witness, Dr. Papinchock.

### B. Dr. Papinchock

McDonald's retained Dr. Joanne McFadden Papinchock as an expert witness to rebut the testimony of Dr. Fitzgerald. In her expert report, among other related opinions, Dr. Papinchock opines that "the sexual harassment policies and procedures used by McOpCo restaurants in Florida, and related practices and training, discourage sexual harassment, provide safeguards to protect alleged victims of sexual harassment, and respond to claims consistent with applicable EEOC guidance." R. 167-1, Dr. Papinchock Rep. at 8. Plaintiffs move to exclude Dr. Papinchock's opinions,

25

asserting that she is not qualified to opine on sexual harassment, her opinions lack foundation, her methodology is unreliable, and she impermissibly opines on ultimate legal conclusions. *See generally* Mot. Exclude Papinchock. The Court addresses each argument in turn.

### 1. Qualifications

As an initial matter, Plaintiffs argue that Dr. Papinchock is not qualified to opine on "sexual harassment generally, or on workplace policies and procedures to prevent or remediate sexual harassment." Mot. Exclude Papinchock at 1. Plaintiffs characterize Dr. Papinchock as a "career expert witness who specializes in employee selection, not sexual harassment." *Id.* at 2. Plaintiffs point out that Dr. Papinchock has never created or taught sexual harassment training courses, has no formal education regarding prevention and remediation of sexual harassment, and has never published any peer-reviewed journal on sexual harassment or any topic. *Id.* From Plaintiffs' perspective, Dr. Papinchock's current position at a human resources consulting firm does not qualify her as an expert. *Id.* at 3. In that capacity, assert Plaintiffs, she "audits employer policies, develops employee selection and promotion systems, and analyzes jobs." *Id.* The way Plaintiffs see it, her primary experience in matters relating to sexual harassment are as a "litigation expert—all on the defense side." *Id.* In short, argue Plaintiffs, Dr. Papinchock is a "hired gun, rather than an expert on sexual harassment." *Id.* Therefore, according to Plaintiffs, her entire testimony must be excluded. *Id.* at 2 (citing, *inter alia*, *Gravitt v. Mentor Worldwide LLC*, 342 F.R.D. 130, 134 (N.D. Ill. 2022)).

McDonald's predictably disagrees, countering that Dr. Papinchock's decades of experience as a Ph.D. and practitioner in the field of industrial organizational (I/O) psychology make her qualified to opine on organizational HR policies and practices, including sexual harassment. R. 200, Resp. Exclude Papinchock at 1. As for her current position, McDonald's notes that Dr. Papinchock is a Principal Consultant whose role includes "auditing HR policies for organizational clients in addition to her litigation-related work." *Id.* at 2–3. The fact that Dr Papinchock has never held a position where her primary job responsibilities concerned sexual harassment, asserts McDonald's, does not make her unqualified to offer the opinions in this case. *Id.* Indeed, points out McDonald's, Dr. Papinchock does not seek to testify as a dedicated "sexual harassment expert," but "her long history of experience handling employee complaints and sexual harassment investigations and advising employers regarding HR policies qualifies her to opine on the HR practices relevant in this case." *Id.* at 4. Nor is it disqualifying, argues McDonald's, that she has not published research or lacks formal education specific to sexual harassment. *Id.* at 4. Finally, simply because she has testified more often as a defense expert does not render her unqualified. *Id.* at 3 (citing *NeuroGrafix v. Brainlab, Inc.*, 2020 WL 3643057, at *5 (N.D. Ill. July 6, 2020) (expert's alleged bias "is not a proper basis on which to exclude his or her testimony under *Daubert* or Rule 702") (cleaned up)).

The Court agrees with McDonald's on Dr. Papinchock's qualifications to testify as to HR policies, including those addressing sexual harassment. "Whether a witness is qualified as an expert can only be determined by the area in which the witness has

superior knowledge, skill, experience or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (cleaned up). As the Seventh Circuit has explained, an expert's specialization, or lack thereof, "typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016). The Court, in determining if an expert's qualifications are sufficient under *Daubert*, may consider the proposed expert's full range of experience and not just his or her professional qualifications. Put another way, under Rule 702, one can be an expert based upon experience. *See United States v. Parkhurst*, 865 F.3d 509, 516 (7th Cir. 2017) ("Training and experience are proper foundations for expert testimony."). Indeed, as the Seventh Circuit has noted, "an expert need not wear a lab coat nor cite peer-reviewed studies to reliably lend his expertise to the trier of fact—experience is an equally valuable teacher." *Artis*, 95 F.4th at 526.

Dr. Papinchock's qualifications make her an expert on human resources, but not on sexual harassment distinct from HR policies. Dr. Papinchock is an I/O psychologist who holds a Ph.D from the University of South Florida. *See* R. 176, Dr. Papinchock Rep., D.1(D) Appendices at B-2. She currently works as the Director of Litigation Support at DCI Consulting Group, and previously held multiple roles in which she actively practiced psychology, including work as a Senior Personnel Psychologist for the Federal Deposit Insurance Corporation, a Senior Research Psychologist for the Social Security Administration, and a Research Psychologist for the Office of Personnel Management. *See id.* As Plaintiffs correctly point out, Dr.

Papinchock has never created or taught sexual harassment training courses, has no formal education regarding prevention and remediation of sexual harassment, and has never published any peer-reviewed journal on sexual harassment. *See* Mot. Exclude Papinchock at 2–3. However, while Plaintiffs seek to exclude all of Dr. Papinchock's opinions due to her lack of qualifications, they do not point to any specific opinions where she impermissibly opines on sexual harassment outside of the HR-context. *See* Mot. Exclude Papinchock at 1–4. So, while the Court agrees with Plaintiffs that Dr. Papinchock is not qualified to opine on sexual harassment outside the HR context, Plaintiffs have not directed the Court to any opinions that she offers that exceed her expertise.

### 2. Reliability

Plaintiffs next challenge Opinions 3 and 6 of Dr. Papinchock's Opening Report and Opinion 5 of her Sur-Rebuttal Report.

In Opinion 3, Dr. Papinchock opined that (1) "HR Consultants, working with Operations Consultants and General Mangers ['GMs'], and at times . . . counsel, have conducted decentralized investigations tailored to respond to alleged incidents of sexual harassment and other unwelcome behaviors"; (2) that the "investigation procedures reflect recommended practices set forth in EEOC guidance"; and (3) that the recommendation and decisions made are "tailored to the individual circumstances identified in each investigation." *See* Dr. Papinchock Rep. at 101. In Opinion 6, Dr. Papinchock opined that, based on a coding study of the complaint and investigation documents produced in discovery, the findings "demonstrate[] that efforts have been

29

made to prevent and respond to unwelcome behaviors that could be classified as sexual harassment . . . [and] when sexual harassment claims were made, the alleged infractions were made, the alleged infractions were investigated and, when appropriate, outcomes were decided quickly to resolve the situation." *See id.* at 197. In Opinion 5 of her Sur-Rebuttal Report, Dr. Papinchock included a table further explaining which factors affected the method by which investigations were carried out at McOpCo restaurants. *See* R. 176-6, Dr. Papinchock Sur-Rebuttal Rep. at 44–45.

Plaintiffs argue that these opinions lack foundation because Dr. Papinchock never compares specific conduct with specific outcomes, even though underlying data was available. *See* Mot. Exclude Papinchock at 5 (citing *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003)). Plaintiffs posit that "if Dr. Papinchock had compared incidents of harassment to specific discipline, she would have found that McDonald's did not appropriately tailor discipline to harassment." *Id.* at 6. From Plaintiffs' point of view, there is too great an "analytical gap" between Dr. Papinchock's conclusions and the record. *See id.* McDonald's, in turn, retorts that Dr. Papinchock's opinion concerning the tailoring of investigations and discipline with respect to complaints of sexual harassment are based on experience and supported by sufficient facts and data. *See* Resp. Exclude Papinchock at 6.

The Court finds that Dr. Papinchock's Opinions 3, 6, and Sur-Rebuttal Opinion 5 are sufficiently reliable to survive Plaintiffs' motion. Dr. Papinchock reviewed the policies, training, and relevant HR witnesses' descriptions of their work, along with

methodological coding of the complaint and investigation records produced in the case. *See* Resp. Exclude Papinchock at 6. Dr. Papinchock can deduce relevant conclusions from this information. *See Joiner*, 522 U.S. at 146. To the extent that Dr. Papinchock failed to adequately compare certain relevant data, such issues would go to the weight given to her opinions, rather than a wholesale exclusion of the same. *See Manpower*, 732 F.3d at 809 ("Our system relies on cross-examination to alert the jury to the difference between good data and speculation.") (cleaned up).

Plaintiffs next take aim at Dr. Papinchock's opinion that McDonald's investigations are tailored to harassment, arguing that she fails to analyze any specific instances of harassment and corresponding investigation. Mot. Exclude Papinchock at 7. From Plaintiffs' perspective, Dr. Papinchock "ignores that around one-third of McDonald's investigations were so poorly documented they could not be analyzed." *Id.* at 8 (citing T.446, Dr. Fitzgerald Rebuttal Rep. at 18) ("She concludes that investigations are timely but neglects to mention that this conclusion is based solely on the approximately two-thirds of investigations that were sufficiently well-documented to consider."). Plaintiffs also challenge Dr. Papinchock's opinion on the scale of the sexual harassment problem at Florida McOpCo as unreliable and unhelpful to the jury. *Id.* at 10. This opinion, contend Plaintiffs, is unreliable for three reasons: (1) most victims of sexual harassment never report; (2) McDonald's did not maintain a central repository of sexual harassment complaints; and (3) many complaints were never documented because managers failed to report oral allegations of harassment to HR. *Id.* The opinion is additionally unhelpful to the jury because

"any layperson can count the number of complainants and calculate its percentage of 33,000." *Id.* at 12.

McDonald's counters that Dr. Papinchock's conclusions regarding the incidence rate of sexual harassment at Florida McOpCo restaurants are the result of reliable descriptive statistical methods and will be helpful to the jury. Resp. Exclude Papinchock at 10. According to McDonald's, Dr. Papinchock explained that "the coding studies underlying the opinion are descriptive analyses of the existing evidentiary record that do not purport to capture every instance of sexual harassment that has occurred in Florida McOpCo restaurants during the relevant period." *Id.* at 10–11. McDonald's further argues that Dr. Papinchock's analysis is more than mere "tallying," and will aid the jury through its "substantial professional judgment involved in systematic coding studies." *Id.* at 12.

The Court agrees with McDonald's. Dr. Papinchock does not purport to capture "every instance of sexual harassment that has occurred in Florida McOpCop restaurants," but rather, aims to provide "descriptive analyses of the existing evidentiary record." Resp. Exclude Papinchock at 11. McDonald's concedes that Dr. Papinchock's analyses are admittedly more difficult given the dearth of sexual assault reporting. *See id.* However, issues inherent in certain fields of data do not render an expert's opinions on such data inherently unreliable. Rather, Dr. Papinchock considered the data available, and readily acknowledged potential limitations. *See id.* (citing Dr. Papinchock Rep. at 265) (recognizing that "[m]any declarations alleged incidents that were never reported"). Dr. Papinchock need not

32

consider every possible data point, including data points outside the available record. *See Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known"). Indeed, whether Dr. Papinchock did not consider *all* possible data goes to the weight of her testimony, not its admissibility. *See Nelson*, 2022 WL 1401529, at *5 (denying defendants' argument that expert's report is "unreliable because it analyzes only a summary of relevant data, rather than all data available" and explaining that "reliability is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used") (cleaned up). So too will Dr. Papinchock's opinions be helpful to the jury. Plaintiffs' contention that a jury can simply "count the number of complainants" to deduce the prevalence of harassment ignores both the large volume of data as well as the complexity of any deductions to be drawn from such calculations.

As part of Dr. Papinchock's Opinion 5, she conducted an "independent study" by "select[ing] restaurants to visit to interview the General Managers regarding policies, practices, and training and to conduct observations of the work space including DHR Policy Postings." Dr. Papinchock Rep. at 134. Plaintiffs contend that Dr. Papinchock's General Manager (GM) study and her opinions based on that study "must be excluded because she failed to use reliable methodology." Mot. Exclude Papinchock at 13. In Plaintiffs' view, Dr. Papinchock "did not control for general demand effects when conducting the study and she did not account for the fact that nine of the 35 GMs she interviewed allegedly harassed their own employes or failed to escalate complaints." *Id.* As Dr. Papinchock explains, "demand effects emerge when

33

one is 'being interviewed in a circumstance where there's a possibility of some negative outcome for [the interviewee],' so an interviewee 'fak[es] good or do[es] impression management." *Id.* at 13–14 (quoting Mot. Exclude Papinchock, Ex. A, Papinchock Dep. at 64:20–21, 65:8-22). Plaintiffs maintain that Dr. Papinchock's "interview protocol and improper methodology" warrant exclusion of her opinions on the issue. *See id.*

Not so, counters McDonald's, as the "GM interview study was based on a statistically valid stratified random sample and used a structured interview protocol, neither of which Plaintiffs meaningfully challenge." Resp. Exclude Papinchock at 13. As for Dr. Papinchock's failure to account for that fact that certain GMs have been accused of sexual harassment or failing to escalate complaints, McDonald's submits that Plaintiffs fail to show the relevance of said concerns to the reliability of the study's method or findings. *Id.* McDonald's argues that the goal of the study was to assess GMs' knowledge and training recall—not to investigate how they responded to past incidents of alleged harassment. *Id.* at 14. Allegations against the interviewer, according to McDonald's, do not bear on the reliability of Dr. Papinchock's interview methods. *Id.*

McDonald's has the better of the argument. As Dr. Papinchock explains, she performed an independent study to gain information upon which to base her conclusions as to the McOpCo restaurants. As part of this study, she utilized a "statistically valid stratified random sample and used a structured interview protocol" for the GM interviews. Resp. Exclude Papinchock at 13. The "interview

34

protocol" Plaintiffs take issue with does not equate to unreliable methodology. Rather, the alleged flaws that Plaintiffs raise go to the *weight* of Dr. Papinchock's opinions concerning the GM study, rather than her methodology concerning the study itself.

Finally, Plaintiffs argue that Dr. Papinchock's Opinion 6 should be excluded because it is not based on reliable methodology. Mot. Exclude Papinchock at 15. Recall that in Opinion 6, Dr. Papinchock found that McOpCo made efforts to prevent and respond to unwelcome behaviors, conducted investigations, and took action based upon those investigations. *See* Dr. Papinchock Rep. at 197. In creating the purportedly unique combinations of sexual harassment, Plaintiffs argue that Dr. Papinchock improperly included behavior that is not sexual harassment. They additionally contend that she failed to apply a consistent approach to categorize these combinations. Mot. Exclude at 15 (citing Dr. Fitzgerald Rebuttal Rep. at 32, 45). McDonald's argues that Plaintiffs mischaracterize Dr. Papinchock's Opinion 6. *See* Resp. Exclude Papinchock at 7 n.3. Namely, McDonald's explains that Dr. Papinchock's opinion analyzes "unwelcome behaviors/allegations"—rather than "unique combinations of sexual harassment"—to ascertain the differences in the alleged incidents. The Court agrees. As such, the Court finds her methodology in Opinion 6 to be sufficiently reliable, rendering such testimony admissible.

### 3. Legal Conclusions

Plaintiffs seek to exclude Dr. Papinchock's opinion that "HR and Operations Personnel with responsibility for McOpCo restaurants in Florida have taken

reasonable care to intervene and investigate allegations of sexual harassment at McOpCo restaurants in Florida and to take action when appropriate." Memo. Exclude Papinchock at 9–10. Plaintiffs argue that this opinion concerning reasonable care amounts to an impermissible legal conclusion that should be excluded under Rule 702. *See id.* at 10 (citing *United States v. Lupton*, 620 F.3d 790, 799 (7th Cir. 2010)). So too, assert Plaintiffs, is Dr. Papinchock's opinion that her tally of documented sexual harassment complaints does not reveal a "wide-scale" harassment problem. *See id.* at 13. This is not only a legal conclusion, argue Plaintiffs, but also constitutes the ultimate merits question for the jury. *Id.* McDonald's, on the other hand, insists that Dr. Papinchock's opinions on both issues "would help a jury to measure Defendants' practices against HR standards," and do not present impermissible legal conclusions. *See* Resp. Exclude Papinchock at 15.

The Court agrees with Plaintiffs that Dr. Papinchock's opinions on both issues—that personnel took reasonable care against harassment allegations and that documented sexual harassment complaints does not represent a "wide-scale" problem—amount to legal conclusions on ultimate issues central to Plaintiffs' claims. *See, e.g.*, *Trahanas v. NW Univ.*, 64 F.4th 842, 854 (7th Cir. 2023) (explaining "reasonable care" element of *Faragher-Ellerth* defense); *Van*, 332 F.R.D. at 270–71 (excluding portions of report that touched upon legal conclusions related to sexual hostile work environment claim); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 330 (N.D. Ill. 2008) ("expert testimony that contains a legal conclusion that determines the outcome of a case is inadmissible"). Consequently, Dr. Papinchock's opinions

36

concerning personnel's "reasonable care" and lack of any "wide-scale" harassment problem are excluded as improper legal conclusions.

## II.    Class Certification

Having addressed the parties' *Daubert* motions, the Court now turns to the motion for class certification and Rule 23(a) requirements. "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties." *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 348 (2011) (cleaned up). To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *Harper v. Sheriff of Cook County*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). In addition to the four Rule 23(a) requirements, a proposed class must also satisfy one of the subsections in Rule 23(b): that "common questions of law or fact predominate over individual ones and that a class action is superior to other methods of adjudicating the case." *Howard v. Cook Cty. Sheriff's Office*, 989 F.3d 587, 597 (7th Cir. 2021) (cleaned up). The named plaintiff bears the burden of proving by a preponderance of the evidence that their proposed class satisfies the requirements of Rule 23. *Id*.

In evaluating Plaintiffs' motion, the Court need not assume the truth of Plaintiffs' assertions and is free to "receive evidence and resolve factual disputes as necessary to decide whether certification is appropriate." *Messner v. Northshore Unv. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). That said, courts "should not turn the class certification proceedings into a dress rehearsal for trial on the merits." *Id*.

"Merit questions may be considered to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Jacks v. DirectSat USA, LLC,* 118 F.4th 888, 895 (7th Cir. 2024) (cleaned up). "A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." *Id.* (cleaned up).

Plaintiffs seek to certify the following class and sub-classes: (1) a Rule 23(c)(4) class consisting of "[a]ll female Crew Members and Crew Trainers who work or worked at any Florida McOpCo restaurant during the period between April 10, 2016 and the time of trial." Mot. Certify at 30; (2) a Rule 23(b)(2) subclass consisting of: "[a]ll female Crew Members and Crew Trainers who currently work at a Florida McOpCo restaurant." *Id.*; and (3) a Rule 23(b)(3) subclass consisting of "[a]ll female Crew Members and Crew Trainers who worked at any time between April 10, 2016 and the time of trial at one or more of the following Florida McOpCo restaurants: 14th street, Debary, Ellenton, Four Corners, Gibsonia, Hobo Junction, Park Boulevard, Osceola Village, Ovation, and South French." *Id.* at 31. Plaintiffs' putative Rule 23(b)(3) subclass seeks damages, while the Rule 23(b)(2) subclass seeks injunctive relief. *See* Mot. Certify at 37–40.

McDonald's argues against certification, challenging commonality, typicality and adequacy of representation under Rule 23(a), as well as predominance and superiority under Rule 23(b)(3). *See* R. 166, Resp. Certify.

An implicit requirement under Rule 23 is that a class be "defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC*, 795

F.3d 654, 657 (7th Cir. 2015). Here, the class is readily ascertainable, as it is clear and membership is based on objective, as opposed to subjective criteria. The Court now turns to the Rule 23(a) requirements.

### A. Numerosity

Rule 23(a)'s first requirement is numerosity. Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 860 (7th Cir. 2017).

Plaintiffs maintain that they satisfy this requirement. The Rule 23(c)(4) class, according to Plaintiffs, includes 33,000 women. Mot. Certify at 31. The Rule 23(b)(2) class includes current employees at approximately 100 McDonald's restaurants. *Id.* (citing R. 181-1, Arendt Decl. ¶ 14). And the Rule 23(b)(3) subclass includes "hundreds of women at each store." *Id.* McDonald's does not argue otherwise. The Court finds that Plaintiffs have satisfied the numerosity requirement, as there is evidence that the class would consist of well over forty members and that joinder of all members would be impracticable.

### B. Commonality

Rule 23(a)'s second requirement is that there exist "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A court need only find a single common question of law or fact, the mere occurrence of all plaintiffs suffering as a result of a violation of the same provision of law is not enough." *Chi. Teachers Union, Local No.*

*1 v. Bd. of Ed. of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015) (cleaned up). Rather, "[t]he claims must depend upon a common contention that is capable of class-wide resolution." *Id.* "A common nucleus of operative fact is usually enough to satisfy" this requirement. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). The Seventh Circuit has instructed courts to "begin the class certification analysis by identifying the elements of the plaintiff's various claims." *Eddlemon v. Bradley Univ.*, 65 F. 4th 335, 339 (7th Cir. 2023) (cleaned up).

Plaintiffs bring claims for sexual harassment, based on hostile work environment and retaliation in violation of Title VII and the Florida Civil Rights Act, Fla. Stat. Ann. § 760. Title VII prohibits discrimination against any employee "because of their sex." 42 U.S.C. § 2000e-2(a)(1). A hostile work environment due to sexual harassment is discrimination based on sex. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986). To establish a hostile work environment claim, a plaintiff must show (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 853 (7th Cir. 2023). "Whether there is a basis for employer liability depends on whether the harasser is the victim's supervisor or co-employee." *Paschall v. Tube Processing Corp.*, 28 F. 4th 805, 813 (7th Cir. 2022). As the Seventh Circuit has explained, "[w]hen a supervisor is the harasser, the employer is strictly liable for his or her conduct, subject to any affirmative defenses that may preclude its liability." *Id.* "When a coworker is the harasser, however, the employer

40

is liable only when the employee shows that her employer has been negligent in either discovering or remedying the harassment." *Id*. In a co-employee harassment case, an employer's legal duty "will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees." *Id*. "To rise to the level of a hostile work environment, conduct must be sufficiently severe pervasive to alter the conditions of employment such that it creates an abusive relationship." *Huri v. Off. Of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015).

Plaintiffs ask the Court to certify this hostile environment sexual harassment case based on the pattern or practice framework established in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1976). Mot. Certify at 30. Plaintiffs seek injunctive relief for the Rule 23(b)(2) sub-class, and individual damages for the ten sample stores for the Rule 23(b)(3) sub-class and 23(c)(4) class. *Id*.

### 1. Pattern-or-Practice Theory

The parties dispute a threshold issue at the outset of the commonality analysis: whether Plaintiffs may pursue a pattern or practice theory for their hostile work environment claim. Plaintiffs contend that they may: from their perspective, the "central liability question justifying prospective relief here is whether McDonald's has an overall pattern or practice of tolerating sexual harassment; that is, whether it 'failed to take effective steps to remedy the company-wide problem of harassment that it knew or should have known about.'" Mot. Certify at 31 (quoting *E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F. Supp. 1059, 1071–77 (C.D. Ill. 1998)).

41

McDonald's, on the other hand, argues that Plaintiffs may not avail themselves of the pattern or practice theory where "the alleged conduct varies and does not manifest in the same way for all putative class members." Resp. Certify at 6.

"The term 'patten or practice' originated with section 707 of Title VII, 42 U.S.C. § 2000e-6(2006)." *EEOC v. Int'l Profit Assocs.*, 2007 WL 844555, at *6 (N.D. Ill. March 16, 2007). Section 707 provides that "[w]henever the [EEOC] has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the [EEOC] may bring a civil action." 42 U.S.C. § 2000e-6(a), (c). As the Seventh Circuit explained, "the patten or practice" language was intended to apply to "repeated, routine" incidents, such as where "a company repeatedly and regularly engaged in acts prohibited by [Title VII]." *King v. Gen. Elec. Co.*, 960 F.2d 617, 622 (7th Cir. 1992).

In support of their motion for class certification, Plaintiffs rely on the Supreme Court's holding in *Teamsters*, 431 U.S. 324, along with *Mitsubishi*, 990 F. Supp. 1059 and *Warnell v. Ford Motor Co.*, 189 F.R.D. 383 (N.D. Ill. 1999), which they maintain unequivocally paved the way for Title VII sexual harassment class actions to proceed under the pattern or practice theory. *See* Mot. Certify 27–31.

*Teamsters* is the seminal case on the pattern or practice framework in a Title VII case. In *Teamsters*, the United States[10] brought suit under section 707 of Title

---

[10]Under 42 U.S.C.A. § 2000e-6(c), starting in 1974, the power of the Attorney General to bring Title VII pattern and practice suits transferred to the EEOC.

VII, alleging that the defendants, a nationwide common carrier of motor freight and a union representing its employees, had engaged in a pattern or practice of discriminatory hiring, assignment, and promotion policies against minority workers with respect to line-driving positions, and that the union's seniority system in the collective bargaining agreement perpetuated the discrimination. 431 U.S. at 328–29. The United States sought both injunctive and specific "make whole" relief. *Id*. at 330.

Applying the test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), the Supreme Court stated that in a pattern or practice case, the EEOC bore the burden of establishing a *prima facie* case of unlawful discrimination. *Teamsters*, 431 U.S. at 336. This requires the EEOC to show that the employer regularly engaged in purposeful discrimination of a group protected by Title VII. *Id*. That is, to show that "discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Id*. To do so, the EEOC "is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." *Id*. at 360. If the EEOC meets its burden and makes a prima facie showing that a discriminatory policy or practice exists, the burden shifts to the employer to disprove the EEOC's case. *Id*. To defeat the EEOC's prima facie showing, the employer must demonstrate that the EEOC's evidence is "either inaccurate or insignificant." *Id*. If the employer fails to rebut the inference that arises from plaintiffs' prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. *Id*. at 361. Such relief might take the form of an injunctive order against a continuation of the

discriminatory practice. *Id.* When the EEOC seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase to determine the scope of individual relief. *See id.* *Teamsters*' application of pattern or practice claims was subsequently extended to private litigants in *Cooper v. Fed. Res. Bank of Richmond*, 467 U.S. 867, 875–76 n.9 (1984).

Courts in this Circuit have applied the *Teamsters* framework to allow pattern-or-practice class actions in sexual harassment cases. *See Mitsubishi*, 990 F. Supp. 1059; *Warnell*, 189 F.R.D. 383. In *Mitsubishi,* the EEOC sought to hold the defendant liable for a pattern or practice hostile work environment. 990 F. Supp. at 1069. The pattern or practice theory was that the defendant created and maintained a sexually hostile and abusive work environment at its auto assembly plant because it tolerated "individual acts of sexual harassment by its employees by refusing to take notice of, investigate, and/or discipline the workers who sexually harassed other employees." *Id*. The defendant argued that the plaintiff could not use the pattern or practice theory because the gravamen of a sexual harassment claim, citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 68 (1986) and *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993), is that the allegedly offensive conduct was subjectively unwelcome. *Id*. at 1069. The Central District of Illinois court disagreed, noting that *Meritor* and *Harris* involved individual charges of discrimination and this was not an individual case, but rather a pattern or practice case and therefore, "the rules of engagement in this context are different." *Id*. at 1070. From the court's perspective, Title VII authorizes

a pattern or practice suit for sex discrimination, and sexual harassment is a form of sex discrimination. *Id*. Therefore, the court held that plaintiffs may bring pattern or practice suit for sexual harassment. *Id*. at 1074. The *Mitsubishi* court reasoned that "the landscape of the total work environment, rather than the subjective experiences of each individual claimant, is the focus for establishing a pattern or practice of unwelcome sexual harassment which is severe and pervasive." *Id*.

The next pattern or practice case cited in support by Plaintiffs is *Warnell*. In *Warnell,* the plaintiffs filed a class action sexual harassment suit alleging that they had been subjected to a hostile work environment at the defendant's assembly and stamping plant. 189 F.R.D. at 385. The EEOC had investigated and concluded that a class of female employees had been subjected to sexual harassment by mangers and nonmanagers. *Id*. The EEOC and the defendant subsequently entered into a Conciliation Agreement to resolve these problems. *Id*. at 386. Defendant opposed the motion for class certification on the basis that "sexual harassment claims by their nature require highly individualized treatment" and therefore common issues of law and fact do not predominate. *Id*. The Northern District of Illinois court disagreed, largely following *Mitsubishi*'s footsteps, explaining that "the existence of a company's policy of tolerating sexual harassment is the basis for pattern or practice liability." *Id*.

McDonald's disagrees with Plaintiffs' position, countering that Plaintiffs' hostile work environment claim cannot proceed under a pattern or practice framework. In support, McDonald's leans heavily on *Van v. Ford Motor Co.*, 332

F.R.D. 249 (N.D. Ill. 2019). *See* Resp. Certify at 5–6. In *Van*, the plaintiffs sought to certify of a class of women seeking damages for sexual harassment and hostile work environment based on a pattern or practice framework. *See Van*, 332 F.R.D. at 275. The *Van* court explained that while *Teamsters* assists the court's analysis of whether a defendant engaged in a pattern or practice, Title VII still defines the scope of prohibited discrimination and sets the boundaries within which the method of proof must operate. *Id.* (citing *Hohider v. United States Parcel Servs., Inc.*, 574 F.3d 169, 183 (3d Cir. 2009)). In other words, "'adopting the *Teamsters* method of proof to adjudicate plaintiffs' claims does not obviate the need to consider the statutory elements' of the specific cause of action pled." *Id.* (quoting *Hohider*, 574 F.3d at 183). The court held that the plaintiffs could not establish Rule 23(a)(2)'s commonality requirement because a pattern-or-practice method cannot satisfy a hostile work environment claim's requirement that the victim subjectively perceived the conduct to be abusive. *Id.* at 275.

In *Van*, as in this case, the plaintiffs relied on *Mitsubishi* and *Warnell*. The *Van* court took issue with the pattern and practice holdings in *Mitsubishi* and *Warnell*, explaining that "[t]o the extent that these cases hold that plaintiffs can establish hostile work environment claims without reference to the subjective experience of each individual claimant, the Court respectfully disagrees." 332 F.R.D. at 275. The court found, like the court in *E.E.O.C. v. Int'l Profit Assocs., Inc.*, these cases "inconsistent with the Supreme Court's hostile work environment jurisprudence." *Id.* (citing *E.E.O.C. v. Int'l Profit Assocs., Inc.*, 2007 WL 3120069, at

*3). *Mitsubishi* and *Warnell*, the *Van* court explained, "overlook the requirement that conduct *subjectively be perceived by the victim to be abusive* in order to be actionable." *Id.* (emphasis added). The court therefore concluded that plaintiffs were unable to establish liability on individual sexual hostile work environment claims based on a pattern-and-practice theory for their damages claim. The court left open the possibility, however, "that a smaller group of Plaintiffs may be able to use the *Teamsters* standard to establish the objective element of their hostile work environment claim, if the group was exposed to the same conduct." *Id.* at 275 n.15.

At least one court since *Van* has adopted its reasoning to conclude that the plaintiffs' purported pattern or practice claim failed for lack of commonality. *See Brown v. Board of Trustees of Univ. of Ill.*, 2022 WL 17547575, at *4–5 (C.D. Ill. Dec. 9, 2022). The court in *Brown* found that, beyond a lack of commonality for the reasons discussed in *Van*, the plaintiffs' allegations that the defendant's nondiscrimination policy and complaint procedure were problematic did not in itself constitute a Title VII violation, as "Title VII regulates conduct; it does not regulate or even mandate organizational policies prohibiting conduct prohibited by Title VII." *Id.* at *4 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998)).

In the absence of binding authority from the Seventh Circuit on the issue, the Court elects to follow *Van* and its sound analysis of relevant Title VII jurisprudence. While Plaintiffs hang their hats on *Teamsters*' trailblazing approach to pattern or practice class actions, *Teamsters* dealt with a pattern or practice of racial discrimination, not sexual harassment. As the court in *Int'l Profit Assocs.* aptly

47

explained, "[i]n contrast with a race discrimination case—where the focus is on the employer's *basis* for making an employment decision that adversely affected the claimant—a sexual harassment case centers on the *gravity* of the conduct to which a claimant was exposed."[11] 2007 WL 3120069, at *3 (emphases in original). The sexual harassment suffered by the individual must have been severe or pervasive enough to constructively alter the terms or conditions of the claimant's employment. *Id.* And this harassment is measured both objectively and subjectively. *Id.* Therefore, "a finding that an employer had a pattern or practice of tolerating sexual harassment in violation of Title VII does not necessarily establish that an individual claimant was exposed to harassment or that the harassment an individual claimant suffered violates Title VII." *Id.*

Moreover, "if, to make a *prima facie* showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012). Both the subjective and objective components related to the severity of the harassment experienced by the class members requires evidence that varies from member to member. As stated above in regard to the subjective component, "if the victim does

---

[11]To be clear, from the Court's perspective, the critical distinction between the claim in *Teamsters* and that here (and in *Int'l Profit Assocs.*) is not race versus sex, but rather discrimination versus harassment (or hostile work environment). A hostile work environment claim premised on harassment due to race also requires that the harassment be severe or pervasive. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018).

48

not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 510 U.S. at 21–22 (1993). And, as the *Van* court held, the objective hostility component of a harassment claim "depends on the specific conduct to which each named Plaintiff and putative class member was exposed." 332 F.R.D. at 276. While the plaintiffs, noted the court, had presented "evidence indicating that named Plaintiffs and putative class members were exposed to a wide-range of conduct that certainly would support hostile work environment claims, the evidence does not suggest that named Plaintiffs and putative class members all were exposed to the same conduct." *Id*. For example, observed the court, "[w]hile some women allege[d] that they [had] been physically assaulted or even raped, others may only have been exposed to 'ambient harassment.'" *Id*. at 277. So too here, the evidence of harassment ranges from physical groping or rubbing of other employees' genitals on class members, to other class members merely witnesses harassment of their co-workers, such as flirting or unwanted touching. *Compare* R. 141-10 at 1–2; R. 137-22, Godwin Decl. ¶¶ 24, 29; R. 137-48, Wiggins Decl. ¶¶ 13–16 *with* R. 137-23, Lomerson Decl. ¶¶ 15–19). Because Plaintiffs' claim for hostile work environment requires evidence that varies from member to member, it involves individual—not common—questions.

Plaintiffs retort that there is "no merit" to the argument that the Court should examine the elements required to prove an individual hostile work environment claim. R. 188, Reply Certify at 4. Instead, they argue that pattern or practice cases require different proof than individual cases. *See id.* (citing *Cooper*, 467 U.S. at 876–

78). Plaintiffs argue that "the Court should thus disregard McDonald's argument that Plaintiffs do not satisfy the commonality requirement because they allegedly cannot prove the elements of an individual hostile work environment claim without common proof." *Id.* Plaintiffs' argument flies directly in the face of relevant jurisprudence on pattern or practice Title VII claims, as explained in *Van. See Van*, 332 F.R.D. at 275 (citing *Hohider*, 574 F.3d at 183).

Plaintiffs also acknowledge that "[c]ourts differ on the precise showing necessary to award individual damages in phase II proceedings," but nevertheless maintain that courts "generally agree" that the analysis of the subjective prong of a hostile work environment claim "is reserved for phase II." *See* Mot. Certify at 30 n.184 (citing *Mitsubishi*, 990 F. Supp. at 1077–82; *Int'l Profit Assocs.*, 2007 WL 3120069, at *17). Plaintiffs seek to skirt this impasse by arguing that "after class certification," the Court should request briefing of the parties' respective views on this issue. *Id.* But the Court's ability to certify the class under the proposed phase I would simply delay, rather than obviate, the inevitable issues arising under phase II. Namely, the Court would still need to ascertain the objective severity of the harassment, as well as the independent states of mind of each plaintiff regarding the purported sexual harassment. *See Edmond*, 2023 WL 3847098, at *5 (explaining that the resolution of the common question concerning policy is "subsidiary" to the hostile work environment claims, and that the "[i]ndividualized issues relating to proving liability . . . would remain").

50

Unlike the plaintiffs in *Van*, Plaintiffs do not provide the Court with alternative routes to certification aside from the pattern or practice theory; they fail to substantively engage with the elements of their claim and instead stylize all requirements of class certification under the umbrella of McDonald's purported pattern or practice. Accordingly, because Plaintiffs fail to satisfy the commonality requirement of Rule 23(b)(3) as applied to their purported class seeking damages—their Rule 23(b)(3) subclass of individuals at the ten sample stores—the Court denies their request to certify this class.[12]

The Court's conclusion regarding the 23(b)(3) class also applies to Plaintiffs' request for issue certification under Rule 23(c)(4). Specifically, Plaintiffs seek certification to determine whether the pattern or practice framework applies to the class as a whole. *See* Mot. Certify at 40. McDonald's argues that Plaintiffs' motion for issue certification under Rule 23(c)(4) fails because Plaintiffs have not connected the proposed issues to the elements of their claims. Resp. Mot. Certify at 38–40. The Court agrees. "Rule 23(c)(4) does not exempt class representatives from the threshold requirements of Rule 23(a)." *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *49 (N.D. Ill. Mar. 31, 2017). Plaintiffs offer no response to McDonald's contention, but instead simply maintain that issue certification is prudent to prove "McDonald's motive, intent, and knowledge." Reply

---

[12]This finding should not be read to imply that hostile work environment class could never be certified. Like the Court in *Van*, the Court "leaves open the possibility that a smaller group of Plaintiffs may be able to use the *Teamsters* standard to establish the objective element of their hostile work environment claim, if the group was exposed to the same conduct." 332 F.R.D. at 275 n.15.

51

Certify at 20. Because Plaintiffs do not satisfy the requirements of Rule 23(a), the Court denies Plaintiffs' request to certify any issue under Rule 23(c)(4).

Finally, the Court denies Plaintiffs' request to certify the Rule 23(b)(2) subclass seeking injunctive relief for several reasons. First, Plaintiffs' Rule 23(b)(2) subclass similarly relies upon their pattern or practice theory. *See* Mot. Class Cert. at 29 ("If pattern or practice liability is established, the court awards injunctive relief"). Because the Court rejects Plaintiffs' invocation of the pattern or practice framework for the Rule 23(b)(3) subclass, so too does it reject Plaintiffs' request to certify the Rule 23(b)(2) subclass for injunctive relief. Second, even if Plaintiffs' Rule 23(b)(2) subclass did not rely entirely upon the pattern or practice theory, it would still fail. As the *Van* court explained, "[a] suit for money damages, even if the plaintiffs seek uniform, class-wide equitable relief as well, jeopardizes that presumption of cohesion and homogeneity because individual claims for compensatory or punitive damages typically require judicial inquiry into the particularized merits of each individual plaintiffs claim." 332 F.R.D. at 291 (quoting *Lemon v. Int'l Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000)). "That [Plaintiffs] have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final." *Id.* (quoting *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 499 (7th Cir. 2012)).

52

Just as was the case in *Van*, Plaintiffs' pursuit of monetary relief is not incidental to their pursuit of injunctive relief: Plaintiffs argue that after the Court awards the requested injunctive relief under the pattern or practice theory, it "then conducts phase II 'additional proceedings' to assess the impact of the discrimination on individual employees and award damages." Mot. Class Cert. at 29. Plaintiffs double down on this proposed course of action: "[t]hus, courts try sexual harassment class actions in phases, with the first phase focused on the employer's liability for tolerating sexual harassment and plaintiffs' corresponding entitlement to injunctive relief, and the second phase focused on issues regarding each class member's individual entitlement to damages." *Id.* at 29–30. It therefore does not appear that injunctive relief "would . . . provide 'final' relief as required by Rule 23(b)(2)." *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 926 (7th Cir. 2011). In such a scenario, rather, "the monetary tail would be wagging the injunction dog." *Id.* The Court therefore denies Plaintiffs' motion to certify the Rule 23(b)(2) class for injunctive relief.

Plaintiffs' pattern or practice theory fails to pass muster. As such, and because Plaintiffs do not provide the Court with alternative avenues through which certification may be achieved, the Court denies Plaintiffs' motion to certify the putative class and subclasses under Rules 23(b)(2), 23(b)(3) and 23(c)(4).

## Conclusion

For the foregoing reasons, the Court: denies Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23 [135]; grants in part and denies in part McDonald's motion to exclude the testimony, reports, and opinions of

Dr. Louise Fitzgerald [162]; and grants in part and denies in part Plaintiffs' motion to exclude the testimony, reports, and opinions of Dr. Joanne McFadden Papinchock [179]. By January 14, 2026, the parties are instructed to file a joint status report with proposed next steps for moving the case forward.

Dated: December 31, 2025

United States District Judge
Franklin U. Valderrama